**Denis E. COSBY**

v.

**The UNITED STATES.**

**No. 88-67.**

United States Court of Claims.

Nov. 14, 1969.

the water power and can exclude riparian owners from its benefits without compensation, or grant the same, as it

Robert Sheriffs Moss, Washington, D. C., attorney of record, for plaintiff. Clayton O. Rost, Palo Alto, Cal., Hart, Moss, & Tavenner, and Thoits, Lehman, & Hanna, Palo Alto, Cal., of counsel.

Steven L. Cohen, Washington, D. C., with whom was Asst. Atty Gen., William D. Ruckelshaus, for defendant. Edward Weintraub, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

OPINION

PER CURIAM:

This case was referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on March 14, 1969. Exceptions to the commissioner's findings of fact and recommended conclusion of law were filed by plaintiff and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby

chooses. United States v. Twin City Power Co., *supra*.

adopts the same as the basis for its judgment in this case.* Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

FLETCHER, Commissioner:

On March 11, 1968, the court entered an order which denied the defendant's motion to dismiss the petition herein on the ground that the plaintiff was barred by the doctrine of laches. Thereupon, the case was remanded to the trial commissioner for trial on the factual issue of whether plaintiff acted under the duress of Federal Aviation Agency (FAA) officials when he submitted a resignation from his position in that agency on November 28, 1961. A trial on that issue has been held.

Based upon a full review of the record developed at the trial, and for the reasons set forth in the following detailed and ultimate findings of fact and conclusions of law, it is concluded that plaintiff has failed to sustain his burden of showing that, in submitting his resignation, he acted under the duress or coercion of his superiors. Therefore, plaintiff's petition should be dismissed.

NICHOLS, Judge (concurring):

I suppose it is unnecessary to clutter up the pages of our reports with concurring views every time the adopted opinion handles the case in a way that differs in some particular from what I would have written. There are pronouncements the world awaits with greater eagerness. Once in a while the practice does serve a purpose, and in this case, my purpose is to avoid any misconstruction of what we are holding by personnel officers and others in the Government.

If an employee's continued presence in an agency is regarded as undesirable, and if he tenders any piece of paper purporting to be a resignation, the tempta-

tion is to snatch at it, thus avoiding the complex ritual and uncertain outcome of an adverse action. It is, I believe, the duty of the personnel officer nevertheless to scrutinize the paper with care, and to reject it as a resignation if it states, clearly or ambiguously, that the resignation is coerced. That was not done here and this lawsuit followed, which in my judgment defendant was lucky to win.

A coerced resignation is not a resignation at all. It is an adverse action which is legally invalid for failure to follow the procedures laid down in statutes and regulations. McGucken v. United States, 407 F.2d 1349, 187 Ct.Cl. 284, cert. filed, 396 U.S. 894, 90 S.Ct. 190, 24 L.Ed.2d 170 (June 11, 1969). It necessarily must follow that a purported resignation which stated on its face that it was procured by coercion would be null and void, and no resignation. In that event, the employee not having resigned, factual inquiry whether he was actually coerced would be irrelevant and unnecessary.

Here the employee, in two purported resignations, both times stated he resigned "under protest." In common speech (see Webster's Third Unabridged, 1968), as well as among lawyers, the words "under protest" in connection with any action, mean that the person taking it does so because he must and not because he wants to. It suffices to rebut any implication that the action was voluntary. Thus, if plaintiff had said no more, he would now be in free. This is what gave me pause when I first considered this case and it may trouble others.

However, plaintiff has used words indicating that to him "under protest" meant something entirely different. The interpretation our trier of fact found most persuasive is that in resigning plaintiff meant to "protest" certain actions of FAA officials (Finding 21). Resignations to register disapproval of

---

* The concurring opinion of NICHOLS, Judge, follows the opinion of the trial commissioner which has been adopted by the court.

the measures of others are not common in American public life, but of course we are all familiar with them in reports of the proceedings of cabinet officers in European parliamentary democracies. An historic example is the resignation of Sir Anthony Eden to "protest" the decision of Neville Chamberlain to enter into the Munich Pact with Adolf Hitler. However unlikely it may seem that plaintiff resigned for this reason, the explanation gains force by the greater implausibility of alternatives.

Plaintiff's able counsel would have us believe that after seventeen years of Federal service, plaintiff supposed he could be fired summarily, without notice or hearing. My own impression is, as a matter of judicial notice, that before learning the location of the snack bar, the typical new Federal employee becomes aware that there is such a thing as tenure, with concomitant trammels on agency freedom to remove him, even for asserted cause. Often this is what attracts him to Federal service. He may not possess the details, but he is sufficiently conscious of the broad outlines to be put on inquiry in case the need for knowing arises. But if this should not be so, it seems to me that an agency which puts itself to the trouble to prepare, publish, and circulate an *Employee's Handbook* such as the one in evidence here, is entitled to presume its employees are aware of the contents. Counsel took sharp issue before us whether our Commissioner was justified in inferring that plaintiff had read, or should have read, this document (Finding 20). Whether he read it or should have read it, under other circumstances, he was certainly unjustified in resigning because of false conclusions as to agency procedure in adverse action cases, without having consulted it, or else was bound by what he should have read. Plaintiff's counsel would in effect have us decide that Employee's Handbooks are futile and a waste of public funds. Thus my analysis of this case imputes to plaintiff, in preparing his formal resignation, Form 52, a duty to know the pertinent rules of his agency as to adverse actions, when such rules are published for employees and readily available to them. This being so, counsel's interpretation (in his Proposed Finding 21) of the language of the two resignations necessarily fails. Since plaintiff could not properly have believed that he was about to be or could be summarily separated from the service without notice and hearing, he could not be understood to imply that he was by his use of the phrase "under protest," in resigning, if any other meaning was tenable. And one was.

If plaintiff did not state in his resignations, understandably to the agency, that they were forced, it then became necessary to establish whether in fact they were forced. This is what the trial was about, and the result was a finding that there was no coercion in fact, and that the resignations were voluntary.

Therefore, nothing decided in this case, as I read it, should be regarded as condoning any relaxation of the vigilance required of the Civil Service Commission and of personnel officers generally, against the acceptance of coerced resignations, whether actually coerced, or so stated in the course of the employee's filling out the applicable form.

## FINDINGS OF FACT[**]

1. The plaintiff is a citizen of the United States, residing at 1198 P Street, Arcata, California. He is now, and at all times hereinafter mentioned was, an honorably discharged veteran of World War II, within the meaning of the Veterans' Preference Act of 1944, as amended, 58 Stat. 390, 5 U.S.C. § 863 (1958) (now 5 U.S.C. § 7512).

[**] Plaintiff has not objected "specifically and with particularity" (see Rule 57(c)(2) to defendant's requested findings of fact. Hence, in some instances, these findings of fact track defendant's requested findings when relevant and supported by the record. See Rule 57(f)(3).

2. For a number of years prior to November 28, 1961, the plaintiff was a classified Civil Service employee with a five-point veterans' preference. He was employed as a Civil Service employee by the Federal Aviation Agency (FAA) as an Electronics Maintenance Technician (General) LA–2370, GS 856–9 Step 7, tenure group 1, in the competitive service, at a salary of $7,425 per annum. His duties included, *inter alia,* inspection and maintenance of electronics aircraft monitoring systems in the Eureka-Arcata area of California, and the reporting of systems malfunctions and failures.

3. Since 1944, plaintiff's employment was in the Western Region of FAA. The Region was divided into "Districts" which, in turn, were divided into "Sectors." In 1954, plaintiff was assigned to the Arcata Sector in Northern California, and, at the time of the events in question, he held the position in that Sector of "lead technician." In that capacity he was responsible for the maintenance of various electronic equipment as well as supervision of less experienced technicians in the Sector. During the period involved, the Sector Chief, S. S. Williams, had assigned plaintiff specifically to the maintenance of the Sector's Distance Measuring Equipment (DME), the Very High Frequency Direction Finding Station (VDF) and the Instrument Landing System (ILS).

4. Another major piece of electronic equipment installed at the Arcata Sector was its Visual Omni-Directional Range (VOR) including its CA–1616 monitor. The VOR is an important navigational aid to the pilot of an aircraft. By tuning an instrument in the cockpit to the VOR frequency, he can fly the aircraft to or from the facility with accuracy. Also, he may use the VOR in conjunction with DME (or by taking cross-bearings on other VOR stations) to determine his aircraft's position with precision.

The VOR monitor itself is not a navigational aid. However, it has the important function of alerting station personnel to the possibility that the VOR equipment is not operating properly and requires attention.

At the time in question, the primary responsibility for maintenance of the Arcata VOR and its monitor was assigned to a technician named Siats. The VOR facility was physically located some 20 miles from Arcata at Table Bluff near Fortuna, California.[1]

5. On August 29, 1961, a relief technician named Freeman,[2] while on duty at the VOR facility, had discovered a malfunction in the VOR monitor. It would not alarm the station until the azimuth selector moved through 170 degrees, whereas in proper operation it should produce an alarm on a movement of only one or two degrees. After a considerable amount of checking, he succeeded in restoring the monitor to normal operation by installing a new tube. In the early hours of the following morning, the Arcata Flight Service Station notified Sector Chief Williams that an alarm had been received from the VOR monitor. He proceeded immediately to the facility and was able to restore it to normal operation. At the beginning of normal working hours on the same day, Freeman told Williams of the difficulty he had encountered with the monitor the previous day. Thereupon, Williams instructed Freeman and plaintiff to visit the VOR facility and investigate the monitor further. They proceeded to the facility and by the use of an oscilloscope detected a defective waveform in the equipment which they traced to a particular tube. They then replaced the tube, and the monitor responded normally. As a recheck, they reinserted the old tube, and surprisingly the monitor continued normal operation. Thereupon, they made numerous efforts to duplicate the original malfunction but were unable to repro-

---

1. Hence, the facility is also referred to frequently in the record as the "Fortuna VOR."

2. Freeman had relieved Siats who at this time was attending equipment maintenance courses at the FAA Academy in Oklahoma City.

duce it. They gave up for the day and returned to the station. The matter was discussed with Williams who then reported the difficulty to the District Chief by a telephone call. The District Chief asked for a written report, and since Williams was scheduled for annual leave commencing September 1, the Chief suggested that plaintiff should prepare such report. Williams instructed plaintiff to prepare the desired report and departed on leave.

6. Plaintiff did prepare a written report and sent it to District Headquarters, but he did not do so until September 20, 1961. He endeavored to justify this rather long delay by testifying that at the conclusion of his joint investigation with Freeman on August 30, he had written a "lengthy report in the log." Since the monthly logs are required to be forwarded by the Chief of the Sector to District Headquarters for review on or before the tenth of the following month,[3] plaintiff apparently assumed that the District was already aware of the problem. He stated that his report of September 20 was intended by him to be in the nature of a follow-up or reminder.

However, the only log entry in evidence covering the period of the plaintiff-Freeman investigation on August 30 reads as follows:

Quarterly maintenance on CA–1616 VOR monitor. Repeated alarm caused by monitor traced to faulty tube socket V3250. Cleaned short and replaced 12AX7 tube. Also 1 each 5R4, 1 ea. 6A56, 1 ea. 6A57 low emission. Operation Normal.

Such a routine entry does not seem calculated to alert the District to any real problem. By contrast, in his written report of September 20, plaintiff described the malfunction first discovered by Freeman, the action taken to correct it, and stated an analysis of the difficulty. His report further stated that attempts to re-

produce the malfunction had been unsuccessful and that "the above condition does not fulfill the requirements of a fail-safe monitor * * *."

7. On October 2, 1961, the Deputy Chief of Systems Maintenance in the District Office, O. J. Rasmussen, replied to plaintiff's report of September 20. After observing that the "experienced trouble could present potentially serious consequences," Rasmussen directed further investigation as to which he made several technique suggestions. He stated that "similar, but not identical, trouble" had been experienced by the monitor at Lakeview, and described what had been done to correct that problem. He concluded by asking plaintiff for a further report. The record does not contain any such further report. However, in an office memorandum, Williams stated that on October 6, 1961, plaintiff had performed the tests requested by Rasmussen and was unable to locate any malfunction, the operation of the monitor being normal. Williams further stated that on October 9, plaintiff prepared a memorandum to the District Office outlining the results of his investigation.

8. The operation of the CA–1616 monitor was normal with no observed malfuction during all of September and October 1961. However, another malfunction occurred on November 7, 1961. By this time Technician Siats had returned to the Sector and had resumed his duties of maintaining the VOR and its monitor. When the malfunction occurred on November 7, plaintiff went to the VOR facility where Siats was already working. They worked together on the problem, and at 4:00 p. m., they made the following entry in the VOR log:

Investigation of CA–1616 monitor; abnormal operations at varying intervals. Numerous checks made by tube substitution & waveform analysis, actual cause of malfunction still under study. Monitor operation normal.

---

3. It will be recalled that on September 1, Sector Chief Williams had left the station on annual leave. He did not return until September 25. During his absence, plaintiff was in charge.

During the rest of November no further malfunction of the monitor occurred. However, because of the intermittent and unexplained failure of the monitor on the three occasions described, the Regional Office VOR specialist was sent to Arcata from Los Angeles on November 28, 1961, to continue the investigation. He ultimately concluded that the CA–1616 monitor should be removed and sent to FAA laboratories in Oklahoma City for extensive engineering tests. After a parallel monitor had been installed, this was done in early 1962. Later in that year, similar monitor malfunctions were reported from two other FAA Regions. After succeeding in duplicating the malfunction, the particular deficiency in the CA–1616 monitor was discovered, and the equipment was modified to correct it.

9. Meanwhile, a latent personnel problem at Arcata involving Williams and plaintiff began to manifest itself. From the record it appears that the two men had never gotten along well together. Plaintiff was convinced that Williams did not have sufficient experience to be the Sector Chief at Arcata. Williams, in turn, had criticized plaintiff's work performance from time to time. In January 1961, Williams had a long discussion with plaintiff regarding his efficiency rating and informed plaintiff that he would receive a satisfactory rating but in the low category.[4] On occasion, also, plaintiff accused Williams of making unwarranted adjustments to equipment for which plaintiff was responsible.

10. Sometime during the summer of 1961, District Chief Lasher visited Arcata and discussed Sector problems with Williams and plaintiff. On that occasion, plaintiff inquired as to why he had not received a promotion. Lasher explained that a prerequisite for promotion was completion of an advanced course at the FAA Academy which plaintiff had not successfully done. Lasher

went on to state that plaintiff, as the lead technician at Arcata, could be of real help to the Sector by carrying out his duties without complaining.

In early November 1961, Williams criticized plaintiff for being behind in his maintenance work schedules and stated that he should correct this situation. As stated above, on November 7, another malfunction occurred in the VOR monitor. On Saturday, November 11, plaintiff telephoned the Deputy Chief of the District, O. J. Rasmussen, at his home in Medford, Oregon, and complained that the working conditions at Arcata were intolerable. He asked Rasmussen to conduct a District level investigation. Williams learned of this from plaintiff on the following Monday and himself called Rasmussen who confirmed to Williams that, as soon as the District Chief returned from a regional conference, he (Rasmussen) would proceed to Arcata and conduct the investigation requested by plaintiff.

11. Rasmussen was unable to leave District Headquarters and proceed to Arcata for his investigation until November 20, 1961. On the morning of November 21, Rasmussen had a conference with Williams and plaintiff. At that time, plaintiff made eight oral charges against Williams which, in summary, questioned Williams' qualifications and competence, accused him of being a dictator so that personnel morale was low, and charged that the VOR monitor trouble was not being taken seriously enough. With these charges in mind, Rasmussen commenced his investigation. He first visited the facility site where he examined the VOR monitor and other equipment, including a check of log entries. All were found to be in order and operating normally. He also questioned Williams on his maintenance procedures and satisfied himself that Williams was a competent technician, and fully qualified to perform the duties of a sector chief. Upon finding that the

---

4. Plaintiff prepared and filed an appeal from this rating but withdrew it the day after it was filed.

equipment was operating normally, that the monitor difficulty experienced on August 30 and November 7 appeared to have been corrected, and that the Sector was being efficiently operated under Williams' direction, Rasmussen concluded that the real problem which had given rise to his investigation at plaintiff's request was not one of a technical nature but was purely a personnel matter. Thereupon, he interviewed other technicians at the Sector. He could find nothing to substantiate plaintiff's charges that personnel morale was low, although he did conclude that Williams was dictatorial at times and applied considerable pressure on the personnel. He discussed this with Williams and cautioned him to be more patient with the personnel at the station.

12. On the morning of November 22, Rasmussen held another conference with Williams and plaintiff. He told plaintiff that his investigation did not bear out plaintiff's charges against Williams and that, therefore, he would recommend no action to remove Williams as Sector Chief. At this point, plaintiff became very angry and threatened to "bust the FAA wide open" unless Williams was transferred to a sector which he was capable of maintaining. He stated his intention to contact his Congressmen, the FAA Administrator, the newspapers, and the Chamber of Commerce. He concluded by stating that if Williams would leave the Sector, plaintiff would drop his charges. Plaintiff was so upset that he requested annual leave, which request was granted, and he departed from the station.

Later in the day, Rasmussen received a telephone call from the Branch Chief and Assistant Branch Chief in the Regional Office at Los Angeles. They told Rasmussen that plaintiff had just complained to the Regional Office about the VOR monitor, and they instructed Rasmussen to remain at the Arcata Sector and check the monitor every day. Rasmussen was to remain at the Arcata Sector until further word from the Regional Office.

13. On November 24, 1961, plaintiff appeared at the station and stated his intention to resign his position. He was given the appropriate Government Standard Form No. 52 to complete and sign. After spending the morning referring to instruction books and personnel manuals, plaintiff stated that he was still upset and desired further annual leave which was granted. He did not file his resignation at that time. However, he called Williams at his home in the evening and stated to Williams that he had telegraphed his resignation to the Regional Office without an effective date of termination. On November 26, however, plaintiff withdrew his resignation and stated that he would be at work on Monday, November 27. Meanwhile, plaintiff had placed a long distance call to the FAA Administrator in Washington, D. C. He succeeded in making contact with one of the Administrator's assistants to whom he complained that the VOR monitor was malfunctioning in the Arcata Sector. The Administrator thereupon referred the matter to the Western Regional Office for investigation of plaintiff's complaints. The Deputy Chief of Maintenance for the Region, Erwin Stentz, was notified at his home that he should proceed immediately to the Arcata Sector and investigate the entire matter. He had already gained some familiarity with the plaintiff's complaints as a result of telephone conversations a few days before with both plaintiff and Rasmussen.

14. Stentz immediately made preparations to proceed to Arcata. He also made arrangements for the Region's VOR specialist, Vernon Cimmery, to join him in Arcata and to bring with him another type of VOR monitor. He viewed the objective of his investigation to be two-fold: (1) primarily to investigate the technical operation of the VOR monitor (and possibly replace it) which made Cimmery's presence desirable, and (2) secondarily, to canvass the personnel situation at Arcata with particular reference to plaintiff's charges against Williams.

Stentz arrived at Arcata on the afternoon of Monday, November 27. He then arranged an evening meeting in his hotel room with Rasmussen, Williams, and Cimmery, the latter having also arrived at Arcata on November 27. Since, at that time, Stentz's knowledge of the entire matter was limited to some information obtained by telephone, he called the meeting so that he could obtain further information from Rasmussen and Williams and then decide upon a plan for conducting his investigation the following day. Plaintiff was not present at this meeting and knew nothing of it. After discussion of the entire matter, Stentz decided that the VOR expert, Cimmery, should not visit the Fortuna VOR until Stentz had concluded his interrogation of plaintiff and had obtained his full statement with respect to the technical problems involving the monitor, together with any personnel problems plaintiff wished to discuss.[5]

15. On the following morning, November 28, 1961, Stentz proceeded to the Arcata Sector Headquarters where he met plaintiff and informed him that the investigation of plaintiff's complaints would commence immediately under Stentz's supervision. Plaintiff requested permission to have his attorney, Frederick L. Hilger, in attendance, and his request was granted. Hilger arrived at the station about an hour later, and Stentz briefed him on Stentz's plan to have a private meeting wherein plaintiff could discuss all his complaints in detail. Stentz further explained to Hilger that, while he was welcome to attend the meeting about to take place at the station, the parties involved would continue the technical side of the investigation by going to the Fortuna VOR facility itself and that, since the VOR monitor problem was an internal agency matter, Hilger was not invited to participate in that portion of the investigation. The described plan was agreeable to Hilger. Whereupon, Stentz, Hilger, and plaintiff assembled in a private room, the only other person present being a Sector secretary who was to take notes.[6] Stentz opened the meeting by stating that its purpose was to obtain plaintiff's statement in his own words regarding his recent complaints both from a technical side and from a personnel standpoint. Following a lengthy opening statement by plaintiff, the remainder of the meeting was conducted substantially on a question and answer basis with all three men participating. It was devoted almost exclusively to a three-way discussion of the technical problems involved in the malfunctioning of the VOR monitor. The meeting lasted about an hour and a half, and at its conclusion, Stentz stated his intention to install a parallel monitor (which was in fact done the next day). Whereupon, Hilger remarked that this would seem to take care of everything plaintiff had in mind. Also, at the conclusion of the meeting, in answer to a question by plaintiff, Stentz assured him that he had done the right thing in reporting his findings even to the extent of going beyond his immediate supervisor to higher echelons in the agency. Hilger remarked he had another client waiting for him, and the meeting was adjourned.

16. Following the above described meeting, Stentz and Rasmussen got into one vehicle and Williams and plaintiff got into another. They proceeded to the Fortuna VOR facility where all four men entered the building housing the VOR

5. It appears that this approach to the investigation was substantially that suggested to Stentz by his superior who felt that plaintiff should be given the opportunity to demonstrate and describe the monitor difficulty without prior interference by Cimmery. If a defect was observed, Cimmery would be available to correct it. If the cause of the previous malfunction remained unknown after plaintiff's demonstration, the plan was for Cimmery to stay at Arcata and take charge of the technical investigation.

6. Stentz also borrowed a tape recorder from the Flight Service Station because the secretary doubted that she could take shorthand fast enough to make a verbatim transcript.

monitor. Stentz stated that his objective at this point in the technical investigation was to give him an opportunity (1) to observe the equipment in person and (2) to see if plaintiff could duplicate the previously observed monitor malfunction. He asked Rasmussen and Williams to leave and stay outside the building. Stentz took this action, according to his testimony, because he knew that plaintiff had considered Rasmussen's prior investigation to have been a one-sided affair. Therefore, Stentz felt that plaintiff should have a fair opportunity to state fully his position and to demonstrate the things he had done in his efforts to repair the monitor without being subjected to any external influences, such as the presence of the very men plaintiff had been criticizing.

17. Stentz asked plaintiff to demonstrate and repeat the tests he had previously performed in an effort to determine whether filament cathode leakage in one of the tubes of the monitor could have produced the reported malfunction. Plaintiff appeared to be reluctant to proceed and stated that it was up to the Regional Office to determine whether there was a defect in the monitor. However, after this initial hesitation, plaintiff did proceed. He started by attempting to use the facility's oscilloscope to test one part of the circuit, but he had difficulty making initial adjustments to the oscilloscope. At this point, plaintiff became very nervous, appeared unable to adjust the oscilloscope, and finally stated that he would not proceed further but desired to talk to his attorney. Stentz felt that plaintiff's refusal constituted insubordination and concluded that he wanted witnesses to plaintiff's statements. Whereupon, he stepped out of the building to call back Rasmussen and Williams. Plaintiff accompanied him and while Stentz was attempting to attract the at-

tention of Rasmussen and Williams, plaintiff made a derogatory statement with respect to Stentz's qualifications. Stentz testified that he displayed anger at this remark, but stated that by the time Rasmussen and Williams had rejoined the group, he had regained his composure.

The four men proceeded into the building where Stentz first reminded the group that he had supervisory authority over everyone in the Arcata Sector. Then, in his capacity as supervisor, he again instructed plaintiff to proceed with the desired tests. Plaintiff refused to do so on the ground that the oscilloscope was defective. Upon being instructed to repair the oscilloscope, plaintiff merely insisted upon seeing his attorney. Stentz reminded plaintiff that his attorney had been present at the morning interview and that all had agreed the attorney would not accompany them to Fortuna on the technical investigation. Thereupon, Stentz and Rasmussen manipulated the controls of the oscilloscope and could find no defects in the equipment. Plaintiff continued to state, however, that he would not proceed. Stentz then stated that he intended to charge plaintiff with gross insubordination which could lead to his summary dismissal from the agency. Stentz did not attempt to specify any of plaintiff's procedural rights but simply referred him to the *FAA Employee's Handbook.*[7] Thereupon, the men departed from the facility in the same fashion as they had arrived.

18. During the return trip to Arcata, plaintiff again rode in the same vehicle with Sector Chief Williams. There was no conversation at all between the two men, but while they were passing through the town of Eureka, plaintiff told Williams that he wanted to resign. Thereupon, plaintiff wrote the following on a

---

7. Among other things, the Handbook advises that "[C]areer employees can be removed only for cause and only after being presented with charges in writing and given an opportunity to reply and to have their reply considered carefully."

piece of white paper and handed it to Williams:

Att Mr S. S. Williams
Chief of Sector 38
Arcata, California
I hereby Resign from FAA at 1.30 PM
Nov. 28, 1961
*under protest*

s/. Denis E. Cosby

When Williams and plaintiff reached Sector Headquarters, Stentz and Rasmussen had already arrived. Williams then handed Stentz plaintiff's handwritten resignation which was immediately accepted by Stentz. Williams asked Stentz for further instructions, and he was instructed to obtain possession of plaintiff's keys, Government driver's license, and identification card. Stentz also invited plaintiff to go into the Sector Office and fill out Standard Form 52 stating thereon his reason for resigning.[8] Plaintiff refused to do so, accused Stentz of threatening him, stated that Stentz would hear more from him later, and that he had advice of counsel from the very beginning in all of this affair. Thereupon, plaintiff departed.

19. A few days later plaintiff did execute Standard Form No. 52 which he dated November 28, 1961, and returned it to the agency. On Form No. 52, plaintiff stated the following:

I resign under protest because I feel that my supervisors forced me into a position called by them "insubordination" which I believe was a reprisal against me because of a complaint I made about unsafe air navigational aids.

Subsequently, in a letter dated June 4, 1962, plaintiff wrote to Joseph H. Tippets, Assistant Administrator of the Western Region, FAA, stating the purpose of his resignation as follows:

My resignation from the FAA on November 28, 1961, was merely in protest to the course the investigation of the Fortuna VOR Monitor was taking at that time.

In his testimony, plaintiff gave yet another reason for his resignation. He testified to his belief that, in view of what had occurred at the VOR facility, he would be fired just as soon as the party had returned to Arcata. In that event, he thought he would be "blackballed" and unable to get another job. He stated that he wrote out his resignation to prevent this from happening.

## ULTIMATE FINDINGS AND CONCLUSIONS

20. Plaintiff's apparently sincere belief that he would be fired by Stentz as soon as he and Williams had returned from Fortuna to Sector Headquarters was purely a subjective reaction on his part. At no time had Stentz, Rasmussen, or Williams ever suggested to plaintiff that he should resign. While Stentz did intend to prefer against plaintiff a charge of "insubordination which could lead to his summary dismissal," Stentz knew that he had no power to fire plaintiff. It is to be inferred from this record that plaintiff also knew that Stentz had no such power. Only a few days before the events of November 28, plaintiff had reviewed the personnel manuals at Sector Headquarters in connection with his then stated intention to resign. See finding 13, *supra.* With such an intention in mind, he no doubt read, or certainly should have read, Chapter XV of the *FAA Employee's Handbook*, which chapter is entitled "Leaving the Service." Prominently displayed there under the heading "Separation for Cause" is the following:

It is the responsibility of your supervisor and personnel officer to separate any employee whose conduct or capacity is such that his removal will promote the efficiency of the service. Any career, career-conditional, or indefinite employee who has successfully completed his probational or trial period and any veterans preference employee who has currently served in an excepted

---

8. At no time did Stentz ask plaintiff what he meant by the words "under protest" appearing on his handwritten resignation.

position continuously for 1 year or more will receive notice in writing of the reasons for any proposed removal action. He will also be given an opportunity to reply, stating why, in his opinion, the action should not be taken. After consideration of the employee's answer, the personnel officer will notify the employee of the final decision of the Agency. This decision can be appealed as described in Chapter VIII of this handbook.

\*   \*   \*   \*   \*   \*

There can be no doubt that when the party left the Fortuna VOR on November 28, plaintiff was greatly upset and distressed by the knowledge that he faced charges of insubordination. However, Stentz did nothing to warrant the plaintiff's subjective and erroneous belief that he would be fired from his job when the party reach Arcata.

21. On this record, it must be concluded that plaintiff's decision to resign on November 28 was not coerced or forced by plaintiff's superiors but was voluntary on his part. It reflected his election to resign rather than to submit to removal procedures. His use of the words "under protest" in the handwritten resignation were unexplained at that time. Later, plaintiff gave differing explanations of what he meant by that phrase. Of those explanations, the most logical one appears to be the one plaintiff gave to the Assistant Administrator of the Western Region of FAA, namely, that his resignation was "merely in protest to the course the investigation of the Fortuna VOR Monitor was taking at that time." See finding 19. In any event, plaintiff has failed to show that either Stentz, Rasmussen, Williams, or any other FAA official did anything on November 28, 1961, which can fairly be equated to coercion or duress.

■■ 22. As stated above, under the facts of this case, it is a permissible in-

ference that plaintiff's resignation reflected his election to resign rather than submit to removal procedures which would necessarily follow Stentz's preferment of the charge of insubordination. From this, however, it does not follow that plaintiff's resignation was coerced. Even where the employee is told that he must choose between resignation and separation,[9] the subsequent choice of resignation is not coerced unless the employee can show that his superior knew or believed that the reasons for the proposed separation could not be substantiated. Autera v. United States, 389 F.2d 815, 182 Ct.Cl. 495 (1968); Popham v. United States, 151 Ct.Cl. 502 (1960); and Rich v. Mitchell, 106 U.S.App.D.C. 343, 273 F.2d 78 (1959), cert. denied, 368 U.S. 854, 82 S.Ct. 91, 7 L.Ed.2d 52 (1961). The case of Paroczay v. Hodges, 111 U.S.App.D.C. 362, 297 F.2d 439 (1961) on remand, 219 F.Supp. 89 (1963) is relied on by plaintiff, but the case is clearly distinguishable from this one. In *Paroczay*, the employee was given the choice between an *immediate* resignation or facing *immediate* charges of alleged homosexual conduct, and his request for time to consider the matter was denied. Here, resignation was never mentioned to plaintiff. Several days after he submitted his informal handwritten resignation, he formalized it by executing a Standard Form No. 52. In the interim, he had ample opportunity to consult his attorney and others regarding the possibility of withdrawing the informal resignation,[10] as well as other possible courses of action. Instead, he formally confirmed the handwritten resignation. Under all these circumstances, plaintiff's resignation must be considered to have been voluntary, and it is, therefore, unnecessary to reach his contention that he was denied the procedural protections afforded by the Veterans' Preference Act of 1944, *supra*.

---

9. Not even a suggestion of resignation was ever made to plaintiff by any of the FAA officials involved. See finding 20, *supra*.

10. It will be recalled that on November 24, 1961, plaintiff had sent a telegraphic resignation to the Region but withdrew it two days later. See finding 13, *supra*.

## CONCLUSION OF LAW

Upon the foregoing findings of fact and conclusions of law, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.