**Robert L. MOLINAR,
Plaintiff-Appellant,**

v.

**WESTERN ELECTRIC COMPANY et al., Defendants-Appellees.**

**No. 75–1374.**

United States Court of Appeals,
First Circuit.

Argued Sept. 11, 1975.

Decided Nov. 12, 1975.

Certiorari Denied March 22, 1976.
See 96 S.Ct. 1485.

Robert L. Molinar, pro se.

John M. Harrington, Jr., Boston, Mass., with whom William G. Meserve, Thomas B. Wheatley and Ropes & Gray, Boston, Mass., were on brief, for appellees.

Before CAMPBELL, Circuit Judge, JULIAN and SKINNER, District Judges.[*]

LEVIN H. CAMPBELL, Circuit Judge.

Plaintiff sued to redress grievances arising out of his employment as a labor attorney with the Western Electric Company from January 23, 1967, to April 15, 1968. At the close of all the evidence the district court directed a verdict for defendants, and plaintiff appeals.

■ We state the facts in the light most favorable to plaintiff, but without neglecting the uncontradicted evidence introduced by defendants. *Pence v. United States,* 316 U.S. 332, 338–40, 62 S.Ct. 1080, 86 L.Ed. 1510 (1942); *Dehydrating Process Co. v. A. O. Smith Co.,* 292 F.2d 653, 656 n.6 (1 Cir.), *cert. denied,* 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961); *Hobart v. O'Brien,* 243 F.2d 735, 741 (1 Cir.) *cert. denied,* 355 U.S. 830, 78 S.Ct. 42, 2 L.Ed.2d 42 (1957).

[*] Of District of Massachusetts, sitting by designation.

Plaintiff Robert L. Molinar worked as industrial relations and litigation counsel for Raytheon Company in Lexington, Massachusetts, from June 1960 until his employment by Western Electric in early 1967. At Raytheon Molinar had principal responsibility for the legal aspects of the company's personnel and industrial relations problems. The vice president and general counsel at Raytheon, who supervised and directed Molinar's work beginning in 1963, testified that Molinar "performed his work to my complete satisfaction." Molinar's annual salary in 1966 was set at $22,500.00.

While at Raytheon, Molinar submitted a personal resume to the American Bar Association Lawyer Placement Service expressing interest in a job with a higher salary, at least in the "upper $20's." This resume came to the attention of defendant Robert A. Levitt, then administrative officer and labor counsel at Western Electric, who arranged to interview Molinar at the Parker House in Boston in October 1966.

The meeting opened with an inquiry by Levitt into Molinar's work at Raytheon. As Molinar testified,

"I told him that I was responsible for all the labor affairs of Raytheon Company, which included [sic] handling arbitration cases, which included arguing cases before the Court of Appeals, specifically the Court of Appeals for the First Circuit on cases that had been appealed from the National Labor Relations Board. I told him that I had legal responsibility for all affairs that the company might have, legal affairs, that the company might have with labor unions or even corporate executives. Quite often I would have to draft agreements for executives who were being employed at Raytheon, and that I was responsible for giving legal advice on the pension plan that Raytheon had, how it applied with the bargain unit people and how it applied to other people; that I had the full responsibility for all affairs involving the corporation of some 40,000 employees with their labor unions and with their people in general."

Levitt then turned to the opening at Western Electric. He said he was authorized to hire someone qualified to take over his own responsibilities, because, Molinar testified,

"in all probability he was going to be promoted or he was going to go into a professor-ship; he was going to leave within a reasonable short time, which he—I said, well, what is a reasonable short time and he said in all probability a year . . . ."

Molinar asked what would happen if Levitt did not leave as expected. Observing that Western Electric had some 200,000 employees as compared with Raytheon's 40,000, Levitt responded that "what occurs then is that you will be given the same duties that you now have at Raytheon." He added, however (as Molinar conceded on cross-examination), that he was "an exacting supervisor in that he required capable and conscientious people in his group." Molinar stated that he needed a minimum of $28,000.00. The meeting ended with the following discussion of job permanency, as described in Molinar's testimony:

"I told Mr. Levitt that I had secure employment at Raytheon Company, and I would not accept employment except for that sort of position with some sort of guarantee of permanency, and he said it was Western Electric's policy not to terminate any employee except for just and specific cause and pursuant to a fair hearing."

Both men left the meeting agreeing to "think about it."

Levitt and Molinar met for a second time on December 19, 1966, when Molinar came to Western Electric's New York offices to speak with Levitt and Levitt's superior, Stephen Fletcher, vice president and general counsel at Western Electric. At a conversation in Fletcher's office, Molinar reiterated his interest in $28,000.00 and his satisfaction with "the company policy" on job security that Levitt had described to him in

October. He told Fletcher, " 'I certainly would be very pleased if I were offered the position to be an assistant to Mr. Levitt, exercising the full responsibilities that he told me I would exercise and under the basis of the company policy.' " Fletcher at this point elaborated on the subject of company policy:

"Mr. Fletcher told me that there was a company policy to the effect that it they hired someone at that level, company policy called for No. 1, him to obtain the approval of the president of the company, which he hadn't yet obtained and, therefore, he couldn't offer me the job at that moment; and No. 2, that if there was any termination of that employment it would also have to be with the approval of the president of the company."

At the end of this conversation, Molinar was asked to wait while Levitt and Fletcher conferred in Fletcher's office. Then Levitt and Molinar went to Levitt's office where the discussion of terms continued. The $28,000.00 figure came up again, and there was more talk of the duties and security of the job:

"The discussion was, I assume if you are offering me this job it's on the same basis that you discussed, that we discussed in October, mainly that I would not be, in case something didn't work out, I would not be terminated except for just and proper cause and pursuant to a hearing, and we also discussed the duties of the job involved.

. . . The discussion was that I would exercise the same responsibilities in terms of handling arbitration case N.L.R.B. matters, all labor affairs, all personnel matters under only minimum supervision, that I would have a job that gave creativity to a lawyer. . . . "

At this point Levitt handed Molinar a written job description, saying, " 'This is the job we are offering to you.' " The description read as follows:

"POSITION CLASSIFICATION

ATTORNEY—LEVEL G

. . .

The incumbent in this position has primary legal responsibility for an important phase of the Company's operations. He may supervise the work of one or more Attorneys.

He may be called upon to advise any level of management concerning problems in his area of legal responsibility or he may be assigned as principal Attorney (or counsel) to a division of the Company.

Attorneys in this category are distinguished by being assigned to tours of duty of the most complex and consequential nature, requiring both the highest degree of specialized knowledge and mastery of broad legal or patent theories and concepts and the creative thinking associated therewith."

Molinar replied that he needed more time to think it over. He returned to Massachusetts and about a week later called Levitt to accept the job:

"I was in Lexington and I called him in New York and told him that I would accept the proposition and would report to work on the basis of all the terms and conditions that we had discussed and he said, 'Very good.' He said, 'We are really happy that you made that decision.' "

Molinar went to work at Western Electric on January 23, 1967, at the agreed salary of $28,000.00. At his new job, he testified, he "wrote legal memorandums, principally." In addition,

"I handled two arbitration cases for Western Electric in North Carolina. I handled an N.L.R.B. case, National Labor Relations Board Case, for Western Electric in the preliminary stages. I

wrote analyses of legal problems that occurred in the office of labor counsel, which was again primarily legal research. I answered the phone calls from several assistant managers of labor relations for Western Electric, who might have day to day problems from different plants that Western Electric had, and these problems might have legal implications and they would call me and ask me what they should do on that situation. That was basically what my duties were."

Dissatisfied with these responsibilities and with the extent of Levitt's supervision, Molinar complained to Levitt on four or five occasions that Levitt was not living up to his promises.

Finally, on November 3, 1967, after less than ten months on the job, Molinar was called into Levitt's office. Levitt explained that things were "not working out," that Molinar was "not sufficiently dedicated and applied to the job," and that as far as Levitt was concerned Molinar was "through." Molinar asked for some time to seek other employment, and Levitt agreed to give him "a maximum of six months." April 15, 1968, was later set as the time for departure.

Between November 3, 1967, and April 15, 1968, Molinar spent much of his time looking for employment elsewhere. However, he continued to work at Western Electric, performing "special assignments," including preparation of legal memoranda, and continued to receive his full salary.

On March 10, 1968, unsuccessful in his search for another job, Molinar wrote to Fletcher to ask reconsideration of his termination and to request a meeting. In the letter he complained that the "projected discharge, conceived and spawned *ex parte* and *in camera,* is unfair, unjust, immoral and illegal," and seemed to suggest the possibility of a lawsuit:

> "Illegality, whether in terms of fraudulent or negligent misrepresentation, breach of the covenant of good faith, *prima facie* tort, or due process, equal protection and fair dealing shall hopefully not need explication in another more laconic communication."

Fletcher met with Molinar on March 15, but refused to reverse Levitt's decision despite Molinar's protests and requests for continued employment by Western Electric.

Finally, a few days before the April deadline, Molinar met with Levitt and agreed to submit his resignation. As Molinar testified,

> "On or about April 9th or 8th or thereabouts I had a discussion with Mr. Levitt and I told Mr. Levitt that I had received a job offer from the National Association of Manufacturers and he expressed some pleasure about it, and I said to him at that time, I said, 'But they are going to be calling for a recommendation and it might be better all around if we, if you could give me some kind of a decent recommendation,' and he said, 'Sure, I will be happy to, but you have got to give me a letter of resignation in return,' and I said, 'Well, what is there to resign? I am not on the payroll. I am not here after April 15th.' He said, 'Well, all I can tell you is that I will give you a good recommendation and give you good recommendations if you submit a letter of resignation,' and I said, 'Well, even though there is nothing to resign, if that is the condition I will submit it.' "

The letter of resignation, dated April 10, 1968, said simply,

> "This is to confirm my earlier communication to you to the effect that I am resiging from the employ of Western Electric Company effective April 15, 1968.
>
> In this connection I attach herewith my Company pass."

On April 13, 1970, just over two years after submitting this resignation and just under two years after its effective date, Molinar brought this action against

Levitt and Western Electric. He complained: (1) that the defendants had by fraudulent misrepresentations lured him away from Raytheon, (2) that they had broken his employment contract and particularly its provisions for assignment of certain duties and for job security, (3) that they thereafter blacklisted him so that he could not find other employment, (4) that they had violated his civil rights, (5) that in these civil rights violations they had conspired with agencies of the federal government, and (6) that they had violated the antitrust laws.

The claims of conspiracy and antitrust violations were abandoned below and are not now in issue. The civil rights claim was dismissed prior to trial upon defendants' motion. On appeal, plaintiff contends that that action was erroneous and also that it was error for the court, at the conclusion of all the evidence, to direct a verdict on the other aspects of his complaint.

## I

The most difficult issue is whether plaintiff produced sufficient evidence to reach the jury on his claim of breach of contract. In urging affirmance of the district court, defendants argue on the one hand that there was no valid contract and on the other that there was no breach. The alleged contract was invalid, they say, for lack of consideration, for indefiniteness, for failure to satisfy the statute of frauds, and for want of authority in Levitt and Fletcher to bind Western Electric to an agreement. And if there was a contract, they say it was never violated since Molinar got the duties he bargained for, and, in any case, resigned voluntarily. To each of these arguments plaintiff responds that the evidence raised questions of fact within the province of the jury to decide. We uphold the district court. Even assuming the jury could have found a valid contract (an issue we do not reach), we

think plaintiff is precluded by law from recovering for any breach.

### A.

We first consider what law to apply. Federal standards govern whether, in light of the applicable rule of decision, the evidence merited jury consideration. *See Byrd v. Blue Ridge Rural Elec. Co-op., Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). But the rule of decision itself is a matter of state law, selected under the conflict of law principles of the state in which the district court sits, here Massachusetts. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

Massachusetts adheres to the early conflicts rule that the place of making governs the nature and validity of a contract. *Dicker v. Klein*, Mass., 277 N.E.2d 514, 515–16 (1972); *West Side Motor Express, Inc. v. Finance Discount Corp.*, 340 Mass. 669, 165 N.E.2d 903 (1960); *see Wetherell Bros. v. United States Steel Co.*, 200 F.2d 761 (1st Cir. 1952). Here negotiations began in a Massachusetts interview, but continued and were completed in New York, where the offer was made. Molinar accepted, subject to terms previously negotiated, in a telephone call from Massachusetts to New York. He now urges that the contract was "made" in Massachusetts as the offer was accepted there. But while the Massachusetts courts have sometimes taken the view that the contract is made in the state where the "last material act" occurs, *see Roto-Lith, Ltd. v. F. P. Bartlett & Co.*, 297 F.2d 497, 499 (1st Cir. 1962); *Milliken v. Pratt*, 125 Mass. 374 (1878). they have not carried this notion to the point of imposing indiscriminately the law of the state where the acceptance originates, *see Dickey v. Hurd*, 33 F.2d 415 (1st Cir.), *cert. denied* 280 U.S. 601, 50 S.Ct. 82, 74 L.Ed. 646 (1929); *Reliance Mutual Ins. Co. v. Sawyer*, 160 Mass. 413, 36 N.E. 59 (1894); *Milliken v. Pratt, supra,*[1] and it seems unlikely that

1. *See also Old Dominion Copper Mining & Smelting Co. v. Bigelow*, 203 Mass. 159, 174, 89 N.E. 193, 200 (1909), *aff'd* 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009 (1912):

"Where a contract is made with a purpose by the parties to it that it shall be performed in a particular place, its validity and interpretation are to be determined by the law of

they would do so today, when travel and communications are such that acceptances may frequently be transmitted from places having only a remote connection with the transaction. Here, while Molinar resided in Massachusetts, the final terms of the purported contract for services in New York had emerged in a meeting between the parties in the New York offices of Western Electric. We think that under the Massachusetts conflicts rule, New York is to be considered the place of making, and we apply New York law to questions of validity and interpretation. Because the contract was to be performed in New York, we also apply New York law to any questions of performance, *see Tarbox v. Childs*, 165 Mass. 408, 43 N.E. 124 (1896).

### B.

The contract of employment for which plaintiff contends carried two obligations beyond payment of salary on the part of defendant Western Electric.[2] First, the Company was to assign Molinar certain duties; and second, it was to fire him only for just and proper cause, and then only after a hearing and with the approval of the Company's president. We consider first whether on the evidence presented the jury could have found that the Company violated any obligation it had assumed to assign Molinar certain duties.

■■ Under New York law,

"If an employee, a fortiori an executive employee is engaged to fill a particular position, any material change in his duties, or significant reduction in rank, may constitute a breach of his employment agreement . . . ."

*Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 10, 330 N.Y.S.2d 33, 40, 280 N.E.2d 867, 872 (1972). We are unable

here to discern any evidence that the duties plaintiff was assigned and the rank he enjoyed differed materially or significantly from those he had bargained for.

Plaintiff testified that in the period before November 3, 1967, when he was told he was through and requested time to look for another job, he handled two arbitration cases and in the preliminary stages a case before the National Labor Relations Board. He also wrote legal memoranda and gave advice to assistant managers of labor relations on labor problems arising from day to day at Western Electric plants.

These responsibilities were not inconsistent with the generalities of the "Position Classification" that Levitt specified as "the job we are offering you" when he extended the Company's offer on December 19, 1966. Plaintiff's evidence does not show that he had less than "primary legal responsibility for an important phase of the Company's operations," or that his work was other than of the "most complex and consequential nature, requiring both the highest degree of specialized knowledge and mastery of broad legal or patent concepts and the creative thinking associated therewith." Apart from these broad requirements, the document is phrased in permissive rather than mandatory terms and carries no promissory obligation. Plaintiff's belief that his work was not commensurate with his abilities was not evidence that the cases he handled and the problems he resolved were unimportant to Western Electric, or that the work he performed was simple or inconsequential.

It may be argued that the "Position Classification" should be supplemented by oral representations allegedly made by Levitt and Fletcher. We hesitate to look behind the document in view of

---

the place where it is to be performed. It is made with a [reference] to that law. . . ."

*But see Wetherell Bros. v. United States Steel Co.*, 200 F.2d 761, 763 (1st Cir. 1952); *Clark v. State Street Trust Co.*, 270 Mass. 140, 150, 169 N.E. 897 (1930).

**2.** The district court's ruling that there was no evidence of contractual liability on the part of defendant Levitt is not contested.

plaintiff's testimony that Levitt explicitly tied his offer, as respects duties, to its terms. But even if we do, there is nothing that would change our view of plaintiff's evidence.

Plaintiff testified that before being shown the "Position Classification" on December 19, he was told he would exercise "the same responsibilities" as at Raytheon. But he also testified that he knew he would be working not directly for the general counsel, as he had at Raytheon, but as "an assistant" to Levitt, whom he knew to be an exacting supervisor. Moreover, when Levitt had first mentioned "the same duties" back in October, he had observed that Western Electric had roughly five times as many employees as Raytheon. In this context "the same responsibilities" can at most be interpreted to mean legal work of the same kind and of similar challenge, and not a position with a similar degree of independence and responsibility within the Company's administrative structure.

There is no evidence that plaintiff received any less than the same responsibilities in this sense. In the nine and one-half month period between January 23 and November 3, 1967, plaintiff handled two arbitration cases and an NLRB case in its early stages, and gave advice on day-to-day-labor problems. Although he testified that he handled "all the labor affairs at Raytheon," including cases before the NLRB and the federal courts, plaintiff introduced no evidence that his litigation workload during a comparable period was any greater at Raytheon than at Western Electric, or that the problems he dealt with were qualitatively different. Some reduction in total responsibility for labor problems would be inevitable upon transfer to the larger company and, especially as he knew he would be under Levitt's supervision, cannot suffice to make out a breach of a promise to assign him the same duties as he had previously exercised. To be sure, his responsibilities were reduced after November 3, 1967, when Levitt announced his discharge. But plaintiff does not suggest that this reduction, as distinct from the prior assignment of duties and from the announced discharge itself, was in violation of his contract rights. The adjustment of responsibilities after November 3 followed Molinar's request that he be given time to look for other employment, and, so far as the record shows, had his full acquiescence.

### C.

■ We turn next to Molinar's assertion that job security provisions of his alleged contract were violated. The contract, he says, guaranteed that he would be terminated only for just and proper cause and only after a hearing and with the president's approval. It is undisputed, however, that he submitted a letter of resignation before his discharge was to become effective. He must therefore deal with the New York rule that an employee who voluntarily resigns cannot maintain a cause of action for wrongful discharge. *Laiken v. American Bank & Trust Co.*, 34 A.D.2d 514, 308 N.Y.S.2d 111 (1970); *Levitz v. Robbins Music Corp.*, 6 A.D.2d 1027, 178 N.Y.S.2d 221 (1958); *Merrill v. Wakefield Rattan Co.*, 1 A.D. 118, 37 N.Y.S. 64 (App.Div.1896). To avoid the rule, plaintiff in effect argues that his resignation followed his discharge and thus had no legal effect, or in the alternative, that the resignation was involuntary because induced by fraud or duress. We find neither argument persuasive.

■ Addressing the argument that he had "nothing to resign" because he had already been fired, we think it clear that plaintiff's discharge had not taken effect prior to the submission of his resignation. It is uncontested that both Molinar and Levitt understood that Levitt's November 3 ultimatum was not to be effective until April 15, 1968. Molinar was paid through that date, and as late as March 10, 1968, was still speaking of the "projected discharge." The argument thus reduces to the contention that plaintiff had been "constructively" discharged by assignment to a job other than that bargained for. *See Marks v.*

*Cowdin,* 226 N.Y. 138, 123 N.E. 139 (1919); *Karas v. H. R. Labs,* 271 App. Div. 530, 67 N.Y.S.2d 15, *aff'd,* 297 N.Y. 494, 74 N.E.2d 192 (1947). But as we have concluded that there was no breach in the assignment of duties, we find that contention without merit.[3]

A more difficult issue is whether Molinar's letter of resignation raised a jury issue of voluntariness. Molinar argues that he was induced to resign by the fraudulent promise that if he did so he would receive good recommendations. But there is insufficient evidence for a jury to find that Levitt when he made the promise intended not to fulfill it, or even that he in fact failed to perform.

■ Plaintiff also seems to argue that the circumstances of Molinar's scheduled discharge, and his inability to find another job, amounted to duress which nullified his resignation. However, Molinar cites no persuasive authority in New York or elsewhere supporting such a position in this factual setting. The New York courts have yet to face the need to define duress in this context, *see Levitz v. Robbins Music Corp., supra.* The most analogous cases appear to be those dealing with resignations by federal employees threatened with discharge. *See, e. g., Rich v. Mitchell,* 106 U.S.App. D.C. 343, 273 F.2d 78 (1959), *cert. denied,* 368 U.S. 854, 82 S.Ct. 91, 7 L.Ed.2d 52 (1961); *Cosby v. United States,* 417 F.2d 1345, 189 Ct.Cl. 528 (1969); *Autera v. United States,* 389 F.2d 815, 182 Ct.Cl. 495 (1968). In these cases, which in accord with New York hold that a voluntary resignation bars a suit for wrongful discharge, the following standard has been laid down:

"Even where the employee is told that he must choose between resignation and separation, the subsequent choice of resignation is not coerced unless the employee can show that his superior knew or believed that the reasons for the proposed separation could not be substantiated. . . ."

*Cosby v. United States, supra,* at 1355. This standard, which we think New York would adopt, limits a claim of duress to resignations extorted as a cover for wrongdoing, and recognizes that resignations in lieu of discharge may in many other instances reflect a mutually beneficial, good faith composition between an employer and employee having different views as to what each owes to the other. Thus here, for Molinar's resignation to be treated as coerced and legally ineffective, it must be shown not only that the projected discharge would amount to a legal breach of contract but that there was bad faith, in that Western Electric knew or believed that the discharge could not be substantiated.

■ Application of the standard is ordinarily for the jury, *see, e. g., Paroczay v. Hodges,* 111 U.S.App.D.C. 362, 297 F.2d 439, 441 (1961). However, the evidence in the present case could not reasonably have supported a jury finding of bad faith in the sense required. Molinar testified that Levitt told him on November 3, in announcing his termination, that he was "not sufficiently dedicated and applied to the job." It cannot be doubted that lack of sufficient dedication or application to the job would constitute just cause for dismissal; and we think the evidence could not rationally support an inference that Levitt disbelieved his allegation.[4] Molinar's admitted dissatis-

---

**3.** We find *Young v. Southwestern Savings & Loan Assoc.,* 509 F.2d 140 (5th Cir. 1975), cited by plaintiff, inapposite. In that case the fifth circuit held that an employee who was required to attend religious services that were repugnant to her conscience had been constructively discharged. Here plaintiff alleges no intolerable or illegal employment conditions other than the Company's failure to give him greater responsibility and independence.

**4.** Arguably Levitt's subsequent willingness to promise "decent" or "good" recommendations was *some* evidence that he in fact considered Molinar a satisfactory employee. However, Levitt was well aware of Molinar's dissatisfaction with the tight supervision at Western Electric, and we find no inconsistency between a conclusion that Molinar had performed poorly at Western Electric and a belief that he had the ability to perform satisfactorily for another employer under other circumstances.

faction with his position and assignments if anything lends support to Levitt's position.

Nor do we think that Molinar's claim of the right to a more formal hearing and to presidential approval of his discharge would support an inference of bad faith. There is no evidence that Molinar claimed these procedural rights until the March meeting with Fletcher, the Company's vice-president and general counsel. At this time, according to Molinar, Fletcher replied, " 'Well, as far as we are concerned we are going through just what we think you have to do. . . .' " Whether or not the oral contract afforded different procedures than were offered was hardly a matter free from doubt, as is underscored by Molinar's apparent failure before March to seek the additional protections he claims he was entitled to. We think the evidence would at most indicate a difference of opinion between Molinar and Western Electric as to the terms of his employment; it does not support a finding of a deliberate flaunting by the Company of rights it was apparent he possessed. Accordingly, we find no possible factual basis for a conclusion that Molinar's resignation was the product of duress. This being so, the resignation is a bar to the present claim of wrongful discharge.

We conclude that "the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict," *Brady v. Southern Ry.*, 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943), and thus affirm the district court's direction of a verdict on the contract claims.

II

Plaintiff also advances two tort claims: first, that defendants lured him away from secure employment at Raytheon by fraudulent misrepresentations as to the nature of his employment at Western Electric; and second, that defendants libelled him by indicating on an internal "Termination of Employment" form dated April 13, 1968, that his conduct with Western Electric had been "unsatisfactory."

The misrepresentation claim, whatever its other infirmities, is barred by the statute of limitations.

■ Since the federal courts apply state statutes of limitations in diversity cases, *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), and since Massachusetts considers its statute to be a provision concerned with remedy and thus part of the law of forum, *Clarke v. Pierce*, 215 Mass. 552, 553, 102 N.E. 1094 (1913), we apply the time periods prescribed by Massachusetts. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

■ The period applicable to plaintiff's misrepresentation claim is two years. M.G.L. c. 260, §§ 2A, 4.[5] The misrepresentations, if any, occurred in October and December of 1966, and were evident to plaintiff, by his own account, at least by November 1967. Plaintiff did not commence this suit, however, until April 1970, well over two years later. His misrepresentation claim is thus barred.[6]

■ The libel claim is equally deficient. The only evidence to support a jury finding of publication consisted of

---

**5.** A 1973 enactment increased the period to three years, but specified that the longer period would only apply to causes of action arising on or after January 1, 1974. St.1973, c. 777, § 4.

In view of our rejection of plaintiff's contract claim, it is not open to plaintiff to argue that the misrepresentation claim is "essentially" an action in contract to which the longer contract statute of limitations should be applied. *See Desmond v. Moffie*, 375 F.2d 742 (1st Cir. 1967).

**6.** Plaintiff has failed to demonstrate the applicability of M.G.L. c. 260, § 9, tolling the statute in cases where the defendant is not resident in the state, as required by *Ford v. Rogovin*, 289 Mass. 549, 194 N.E. 719 (1935).

printed markings on the Termination of Employment form indicating that it was to be routinely distributed to divisions within the Western Electric organization.[7] Under both Massachusetts and New York law such limited distribution under the circumstances would be conditionally privileged and actionable only upon proof of actual malice. *See Bander v. Metropolitan Life Ins. Co.*, 313 Mass. 337, 47 N.E.2d 595 (1943); *Stillman v. Ford*, 22 N.Y.2d 48, 290 N.Y.S.2d 893, 238 N.E.2d 304 (1968). There is no evidence in this case from which a jury could find such malice, even assuming that it was defamatory to characterize Molinar's conduct as unsatisfactory.

### III

■ Finally, plaintiff contends that it was error to dismiss before trial his allegation that Western Electric violated his constitutional rights. Essentially plaintiff argues that he should have been given an opportunity to show that his dismissal by the Company was state action depriving him of property without due process and giving rise to a cause of action under 42 U.S.C. § 1983. Under the Supreme Court's decision in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), this argument is unpersuasive.

In *Jackson* the Court upheld the dismissal of a claim that a power company's termination of service was actionable under § 1983. Although persuaded that the company was "a heavily regulated privately owned utility, enjoying at least a partial monopoly in the providing of electrical service within its territory," *id.* at 358, 95 S.Ct. at 457, the Court held that the termination of service was not state action. In so holding the Court rejected arguments similar to those offered here, that state action could be inferred from the company's monopoly status and from extensive regulation.

In this case plaintiff's allegations suggest less regulation by state government than existed in *Jackson*; the focus here is rather on federal involvement that is irrelevant under § 1983, *see Blackburn v. Fisk Univ.*, 443 F.2d 121, 123 (6th Cir. 1971). Moreover, plaintiff's allegations show a far more attenuated connection between such state regulation as exists and the company conduct of which he complains, *see Martin v. Pacific Northwest Bell Tel. Co.*, 441 F.2d 1116, 1118 (9th Cir.), *cert. denied*, 404 U.S. 873, 92 S.Ct. 89, 30 L.Ed.2d 117 (1971).

*Affirmed.*

---

7. Plaintiff offers no authority in support of his theory that external publication could be inferred from his inability to find work after 1968 and from the size of Western Electric; we think the inference too speculative to withstand a directed verdict.