**John R. MIDDLETON, Petitioner,**

v.

**DEPARTMENT OF DEFENSE, Respondent.**

**No. 98–3409.**

United States Court of Appeals, Federal Circuit.

Aug. 10, 1999.

Kristin D. Alden, Passman & Kaplan, P.C., of Washington, DC, argued for petitioner. With her on the brief was Edward H. Passman.

Michael D. Austin, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With him on the brief were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, and James M. Kinsella, Assistant Director.

Before MICHEL, PLAGER, and RADER, Circuit Judges.

MICHEL, Circuit Judge.

John R. Middleton petitions for review of a final decision of the Merit Systems Protection Board (the "Board"). *Middleton v. Department of Defense*, No. DC–0752–97–0950–I–1, 80 M.S.P.R. 467 (M.S.P.B.1998). The full Board denied Dr. Middleton's petition for review on August 28, 1998, by operation of law rendering as the final decision of the Board the administrative judge's (the "AJ's") December 24, 1997 initial decision. This decision determined that the Board lacked jurisdiction over Dr. Middleton's appeal. In it he alleged that his retirement from the Department of Defense (the "DOD") was involuntary, and that a settlement agreement he entered into in order to secure recission of a removal decision likewise should be set aside as involuntary. After discussing how the affidavits and other documents submitted by petitioner in response to an Acknowledgment Order failed to establish jurisdiction, or even plead sufficient non-frivolous allegations of involuntariness to warrant a hearing, the Board dismissed the appeal. Given the background circumstances surrounding Dr. Middleton's decision to retire, including the shortness of time for his decision, his serious health problems, and the remote foreign job site, we conclude that Dr. Middleton did make sufficient non-frivolous allegations of coercion and misinformation to warrant an evidentiary hearing. We therefore hold that the Board abused its discretion in denying Dr. Middleton an evidentiary hearing on the issue of the voluntariness of his retirement. Accordingly, we reverse the Board's denial of a hearing, vacate the Board's finding of no jurisdiction, and remand for an evidentiary hearing to properly decide the issue of voluntariness.

## BACKGROUND

On June 4, 1997, Dr. Middleton retired from the Department of Defense Dependent Schools (the "DODDS"), effective August 1, 1997, after more than thirty-five years of service, in order to preserve certain benefits and avoid removal for misconduct pursuant to a May 30, 1997 decision letter. The misconduct concerned a school piano. At the time of his retirement, Dr. Middleton held the position of Assistant Principal for the DODDS at the high school located at the United States Air Force base at Incirlik, Turkey.

In early February 1997, Dr. Middleton took home a piano from the local DODDS elementary school, believing, he alleges, the instrument to be abandoned or surplus. Although he conferred first with the elementary school clerk regarding his intention to remove the piano, Dr. Middleton failed to seek or obtain the necessary approval of the elementary school principal. Dr. Middleton asserts that the clerk told him the piano was not being used, was not on the elementary school property book, and that he, the clerk, would prepare the necessary paperwork to remove the piano from United States government property accounts. According to the government, the piano was used for Sunday school classes, and was listed on the *high school* property book. Furthermore, the supply clerk later wrote a statement maintaining he never gave Dr. Middleton permission to take the piano.

On February 19, 1997, Dr. Middleton was ordered to return the piano, which he did the following day. While the piano was in his possession, Dr. Middleton had spent $200 repairing it.

On February 27, 1997, Dr. Middleton explained in writing to his superiors that he had thought he could lawfully take the piano, because he believed that it was surplus or abandoned property and because he believed the supply clerk had given him permission to do so. He received no response. Why, the record does not reveal. Nothing further happened for about three months.

According to Mrs. Middleton, Dr. Middleton's wife, "bad blood" had long existed between Samuel D. Menniti, the high school principal, and Dr. Middleton. In her affidavit, she states that Mr. Menniti treated her husband as an "underling of the lowest rank," that he was jealous of Dr. Middleton's academic achievements and career, and that Mr. Menniti felt "threatened" professionally.

In any event, suddenly on May 16, 1997, Dr. Middleton received notice of his proposed removal from government service from Mr. Menniti. On May 30, 1997, Dr. Thomas Ellinger, superintendent of the DODDS's Turkey district schools, the deciding official, executed a notice of final decision to remove Dr. Middleton, effective June 13, 1997, and delivered it to him on June 2, 1997. The notice stated that Dr. Middleton should begin to make arrangements to leave the military installation and to surrender his identification and ration cards by June 13, 1997. Dr. Middleton asked Dr. Ellinger to reconsider his decision, but he refused. Dr. Middleton also requested a time extension, citing the bureaucratic difficulties of wrapping up his affairs in such a short time period. Dr. Ellinger refused to grant the requested time extension, or indeed any time extension.

Two days later, on June 4, 1997, Dr. Middleton submitted a Standard Form (SF) 52, requesting voluntary retirement effective August 1, 1997, so that he could "receive full retirement benefits after serving in DODDS for many years." [1]

On June 12, Dr. Middleton entered into a settlement agreement in the form of a memorandum of understanding (an "MOU"), in which the DODDS agreed to rescind its removal action if he completed his resignation. Dr. Middleton contended before the Board that his signature on the MOU was obtained by coercion, duress, and misinformation.

In support of his argument that his retirement was involuntary, Dr. Middleton submitted a sworn affidavit stating, as summarized by the Board, that:

> (1) he received the May 30, 1997, decision letter on June 2, 1997, which informed him that his removal would be effective on June 13, 1997, only eleven days after he received the decision letter; (2) it became clear to him that, as a result of the termination, he would have had to leave the military post and the country within eleven days, which would have required an impossible series of administrative tasks, including, but not limited to terminating his rental agreement, arranging for clearing the military installation, and arranging for customs clearance; (3) he pleaded for an extension of time to deal with these matters, but Dr. Ellinger refused; (4) Dr. Ellinger told the appellant that he had but one alternative, to retire, in which case he could remain on base until August 1, 1997; (5) he was also told that if he did not retire, the removal action would be immediate and result in the loss of both his and his wife's life insurance and health benefits (benefits which were critical to [Dr. Middleton] because he had been diagnosed with cancer and was recovering from broken ribs and a gallbladder operation).

*Middleton v. Department of Defense*, DC–0752–97–0950–I–1, slip op. at 2 (M.S.P.B.

---

[1] Thus, by retiring, Dr. Middleton secured nearly two months, instead of merely eleven days, to wind up his affairs and depart Turkey. In light of the relatively minor misconduct with which Dr. Middleton was charged, and considering his clean DOD record, it is plausible that the Board might have reduced as "grossly disproportionate" the removal penalty, had Dr. Middleton chose to challenge the removal action rather than resign. *See, e.g., Miguel v. Department of the Army*, 727 F.2d 1081, 1083 (Fed.Cir.1984). This plausibility lends support to Dr. Middleton's contention that he wanted to contest the removal action, but felt compelled to request retirement, for reasons detailed *post*.

Dec. 24, 1997). The DOD submitted no affidavits or other evidence contradicting the factual assertions of Dr. Middleton's submissions.

On appeal to this court, Dr. Middleton argues that the Board's determination that his retirement was voluntary, and, thus, that his appeal fell outside its jurisdiction, was not in accordance with law, obtained without procedures required by law or regulation, namely an evidentiary hearing, and not supported by substantial evidence. Specifically, Dr. Middleton argues that, in the various submissions he filed, he made non-frivolous allegations in support of his claim that his retirement resulted from duress, coercion,. and misinformation by the DODDS as to his right to challenge the voluntariness of his retirement. In his briefs, he asks us to vitiate his retirement and the MOU and reinstate him. The sole relief he requested at oral argument, however, was a remand for an evidentiary hearing.

We have jurisdiction under 28 U.S.C. § 1295(a)(9) (1994).

## DISCUSSION

### I.

■ The Board's jurisdiction is limited to adverse personnel actions expressly made appealable to it by law, rule, or regulation. *See* 5 U.S.C. § 7701(a) (1994); *Forest v. Merit Sys. Protection Bd.*, 47 F.3d 409, 410 (Fed.Cir.1995). Although retirements and resignations are not so designated, if shown to be involuntary they are treated as constructive removals and thus within Board jurisdiction. *See Mintzmyer v. Department of Interior*, 84 F.3d 419, 423 (Fed.Cir.1996). Whether the Board has jurisdiction to adjudicate a particular appeal is a question of law, which we review *de novo*. *See King v. Briggs*, 83 F.3d 1384, 1387 (Fed.Cir.1996).

■ One of this court's predecessors, the United States Court of Claims, laid down a clear, concise standard for determining the voluntariness of a resignation in *Christie v. United States*, 207 Ct.Cl. 333, 518 F.2d 584 (1975).[2] This case established the following three-part test for determining when coercion or duress vitiates an apparently voluntary resignation: "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party." *Id.* at 587. This test is an objective, rather than subjective one; an employee's subjective feelings are irrelevant. The employee must present allegations of fact which, if proven, establish that a reasonable employee confronted with the same circumstance would feel coerced into resigning. *See Braun v. Department of Veterans Affairs*, 50 F.3d 1005, 1007–08 (Fed.Cir.1995) (holding that a former Department of Veterans Affairs employee "made a non-frivolous allegation that, if proven, could establish that his resignation was coerced," which is "all that is required to trigger the Board's jurisdiction at this threshold stage"). The same standards apply to retirement decisions. *See Staats v. United States Postal Serv.*, 99 F.3d 1120, 1124 (Fed.Cir.1996).

■ Employee resignations and retirements are presumed to be voluntary, and usually, as here, are evidenced by a formal document signed by the employee. This presumption may only be rebutted by a showing of sufficient evidence to establish that the retirement or resignation was involuntary. *See Christie*, 518 F.2d at 587. The former employee bears the burden of pleading and proving involuntariness.

■ In order to be entitled to an evidentiary hearing before the Board on jurisdic-

---

**2.** The decisions of the Court of Claims are binding precedent for our court's panels. *See* *South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed.Cir.1982) (*in banc*).

tion, such an employee must make non-frivolous allegations that, if proven at an evidentiary hearing, could establish Board jurisdiction. "Moreover, the requirement that an employee make a threshold non-frivolous allegation of jurisdiction in order to be entitled to a hearing applies even with respect to a jurisdictional issue such as involuntariness, which is closely tied to the merits of the underlying claim." *Staats*, 99 F.3d 1120, 1125; *see also Braun*, 50 F.3d at 1008; *Dumas v. Merit Sys. Protection Bd.*, 789 F.2d 892, 894 (Fed.Cir.1986) (holding that the threshold determination upon the government's motion to dismiss an employee's appeal from a removal action was whether he "allege[d] facts which if proven could make a *prima facie* case of involuntariness"). We examine Dr. Middleton's allegations in light of this standard.

## II.

▉ We hold that the Board abused its discretion when it denied Dr. Middleton's request for an evidentiary hearing. For the reasons detailed below we are convinced that Dr. Middleton made sufficient allegations to warrant an evidentiary hearing as to the voluntariness of his retirement and of his signing the MOU (and, hence, of jurisdiction). Dr. Middleton alleged that he faced overwhelming time pressure to leave Turkey, that he faced pressures from ill health, and that he relied to his detriment on various misrepresentations by the DODDS.

▉ In its decision, the Board considered *separately* Dr. Middleton's allegations of (1) coercion and duress; and (2) of misinformation. All relevant non-frivolous allegations, including background facts, however, must be viewed as a whole when determining whether, if proven, they could establish a *prima facie* case of involuntary retirement.

## A.

Dr. Middleton alleged that the amount of time he was given in the removal notice he received on June 2—eleven days—was insufficient to arrange his affairs, leave the military base, and depart Turkey by June 13. This allegation is based on the May 30, 1997 decision letter from Dr. Ellinger, superintendent of Dr. Middleton's school district, directing Dr. Middleton to arrange for the return of his identification and ration cards by the close of business on June 13, 1997. The letter read, in pertinent part:

> You are directed to return to Mr. Menniti, Principal, Incirlik High School, any U.S. government or DODDS property that is in your possession. The termination of your employment will also require the return of your identification card and ration cards, if any, and those of your dependents if you are the sponsor of individuals who are your dependents. Therefore, you should *begin immediately to make arrangements* for clearing the military installation, terminating any rental agreements, and arranging for the exercise of any transportation entitlements. You are to contact Mr. Menniti, *by close of business on June 13, 1997, to arrange for return of your identification and ration cards.* (emphasis added).

The government does not dispute the accuracy of any of the information contained in this letter. It does contend, however, that, implicit in the removal notice was a recognition that, so long as Dr. Middleton began making arrangements to leave Turkey by June 13, he would not be forced off the base. No evidence is provided by the government that Dr. Middleton in fact drew such an inference, nor that a similarly situated reasonable employee would have, either. On the contrary, it appears that only by resigning could Dr. Middleton extend the time to leave from eleven days to eight weeks, since Dr. Ellinger told him removal would give him only until June 13, while retiring would give him until August 1 to depart.

It strains credulity and logic, moreover, to suggest, as the government apparently does, that a fired employee could expect to remain on the base. Nor is it reasonable to suppose a fired employee could retain his identification and ration cards so long as he had made arrangements before June 13 to surrender them at some later time.

"Time pressure to make a [retirement or resignation] decision has, on occasion, provided the basis for a finding of involuntariness, but only when the agency has demanded that the employee make an immediate decision." *Staats*, 99 F.3d at 1126; *see also Paroczay v. Hodges*, 297 F.2d 439, 441 (D.C.Cir.1961); *see generally Cosby v. United States*, 189 Ct.Cl. 528, 417 F.2d 1345, 1355 (1969). We think that Dr. Middleton's allegations of unreasonable time pressure, if proven, could well suffice.

In order to depart Turkey in eleven days, Dr. Middleton and his wife would have to have completed a number of complex administrative tasks, negotiating both American and Turkish governmental, as well as private, bureaucratic procedures. The Middletons would have to be cleared by various agencies on the military base, including the hospital, library and post office. Also, they would have to arrange a meeting with their Turkish landlord to terminate their lease. Utilities, telephone, and cable television services would have to be terminated by visiting those respective offices. Furthermore, the Middletons would have to arrange an appointment with the military agency which handles the moving of household goods. In addition, both Turkish and American customs officials would have to be contacted to make appointments for their respective inspections. Only after this formidable series of tasks had been accomplished could an actual moving date even have been scheduled, much less carried out. The activities the Middletons would allegedly have had to perform in those eleven days were considerable, especially in light of Dr. Middle-

ton's age, poor health, and recent surgery. If these allegations are proven true, we think they could establish duress.

This case is distinguishable from those where because "an employee has been given a period of time, such as two weeks, in which to consider his options, time pressure has not been regarded as a factor indicating involuntariness." *Staats*, 99 F.3d at 1126. In *Staats*, we found that, contrary to Mr. Staats's contentions, he was given adequate time to decide whether to take an offer of early retirement arising from the 1992 Postal Service reorganization. *See id.* In fact, he had "several months to consider his alternatives, including several weeks after the Postal Service had announced that employees subject to reassignment in the reorganization would not have their pay or grade reduced." *Id.* Dr. Middleton's allegation that he was given a choice between retiring and departing two months later or suddenly uprooting his family from a U.S. military base in Turkey and leaving the country within eleven days is a far cry from Mr. Staats's opting, stateside, after several months of consideration, to take advantage of an early retirement package stemming from a long-planned and widely publicized agency reorganization. Dr. Middleton's claims, we think, at the very least, constitute a non-frivolous allegation that he was coerced into making a nearly immediate decision whether to retire in lieu of removal, based on the circumstances and his ill health. We need not rely, however, solely on facts relating to time pressure, because he pled other types of involuntariness as well.

### B.

 Dr. Middleton also alleged that he was induced into signing the MOU and retiring based in part on DODDS misinformation, including the supposed loss of health and life insurance benefits if he did not retire but was removed, and his

purported right to appeal after retirement. This court has held that "[a] resignation or retirement is involuntary if it is obtained by agency misinformation or deception." *Covington v. Department of Health and Human Servs.*, 750 F.2d 937, 942 (Fed.Cir.1984).[3] "A decision made 'with blinders on,' based on misinformation or a lack of information, cannot be binding as a matter of fundamental fairness and due process." *Id.* at 943. As with time pressure, the standard is not subjective, but, rather, objective: whether "a reasonable person would have been misled by the agency's statements." *Scharf v. Department of the Air Force*, 710 F.2d 1572, 1575 (Fed.Cir.1983) (holding that an employee's "optional retirement from the federal civil service was an involuntary retirement" where the employer's statement to the employee "was misleading under an objective test, and that petitioner, indisputably a reasonable man, in good faith, justifiably relied on this misleading advice to his detriment"). There is no requirement that the misinforming be knowingly deceptive. *See Covington*, 750 F.2d at 942. Further, an employee can make a factual showing sufficient to obtain a Board hearing on misrepresentation-based involuntariness, despite falling short of the showing necessary to mandate a hearing based on coercion-based involuntariness. *See Staats*, 99 F.3d at 1125.

Here, the facts on misinformation as alleged by Dr. Middleton are probative and sufficient, at least when viewed against the background facts. First, Dr. Middleton alleged that his district superintendent, Dr. Ellinger, told him that if he did not retire and sign the MOU, the removal action would result in the loss of both Dr. Middleton's and his wife's health and life insurance benefits. Dr. Middleton's ill health and costs associated with present and future medical care at the time were of paramount concern to him. He had recently undergone surgery for kidney stones, was recovering from broken ribs and a gall-bladder operation, and suffered from prostate cancer. Therefore, cancellation, as threatened, of health and life insurance benefits was of overwhelming concern to him.

Second, according to Dr. Middleton's affidavit, he spoke to an employee in the office of Linda Councill, an attorney for the DOD Education Activity in Washington, D.C. This employee, whose name Dr. Middleton could not remember, allegedly informed him that "he could appeal [the removal action] even after retirement." Dr. Ellinger had provided Dr. Middleton with Ms. Councill's name, address, and phone number, after explaining that Dr. Middleton could arrange to receive a petition to appeal the removal action by contacting her. The fact that Dr. Middleton subsequently attempted to contact Ms. Councill strongly supports his assertion that he wanted to contest the removal. Furthermore, the fact that he specifically inquired as to the means for filing an appeal from the removal decision also shows plainly his intent to rely upon her office's answer.

---

3. In *Covington*, the petitioner, a Community Services Administration (a "CSA") employee, received a reduction-in-force (a "RIF") notice informing him that the CSA would soon cease to exist, and that he had no right of assignment to another position. *See id.* at 939. Relying on this information, Mr. Covington chose to retire. *See id.* The information contained in the RIF notice, however, was incorrect in "material ways." *See id.* at 942. The RIF notice erroneously stated that the agency would be abolished and that Mr. Covington had no right of assignment to another position. *See id.* Although the agency had not intentionally deceived Mr. Covington, his reasonable reliance to his detriment upon the "misleading and erroneous" information contained in the RIF notice rendered his retirement involuntary. *See id.* Dr. Middleton, like Mr. Covington, alleged that the incorrect information he received from the government regarding his employment situation so misled and confused him as to affect his decision to resign, or contest the removal action.

Third, Dr. Middleton claims that Dr. Ellinger had informed him that, according to "Headquarters" in "Washington," despite his retirement, he could still appeal his removal to the Board even after signing the MOU, so long as the appeal was timely filed. Following his own conversation with Ms. Councill's office, Dr. Middleton met again with Dr. Ellinger, on June 9, 1997. According to Dr. Middleton's affidavit, when he related the contents of his conversation with Ms. Councill's office to Dr. Ellinger regarding having an opportunity to appeal the removal action, Dr. Ellinger responded, "Yes, keep it within the time limit and most of the time the appeal will be granted." Dr. Middleton claims that he relied on these three alleged misrepresentations in deciding to sign the MOU and retire.

### C.

 The government argues, as the Board found, that by willingly signing the MOU, Dr. Middleton waived all rights to appeal the removal action or challenge his retirement. The Board's piecemeal analysis of Dr. Middleton's allegations may have blinded the Board to what is clear to us: namely, that Dr. Middleton's allegations, taken as a whole, entitle him to an evidentiary hearing on the voluntariness of his retirement. Indeed, the sole relief requested by appellant is an evidentiary hearing. Dr. Middleton is not seeking a ruling of involuntariness. At this preliminary stage, then, we must concern ourselves only with the allegations as to the circumstances surrounding the execution of the MOU and the decision to retire. Moreover, as an appellate court, we may not find facts or assess credibility.

Dr. Middleton's allegations of detrimental reliance in signing the MOU on what is plainly misinformation may well be sufficient. If proven, they could establish a *prima facie* case of involuntariness, espe-cially in combination with the allegations of coercion relating to the removal decision, and the background circumstances of ill health, time pressure, and complicated departure procedures at this distant base. Such allegations cannot be summarily determined adversely merely by looking to the documentary record. *See Dumas,* 789 F.2d at 894 ("[I]f the alleged facts are sufficient to support a *prima facie* case of involuntariness, the issue can not be summarily determined adversely; the petitioner is entitled to an evidentiary hearing on the issue.... ").

It may well be that, after an evidentiary hearing with live testimony, Dr. Middleton will be found to have voluntarily retired and to have so executed the MOU. But if so, it will likely depend on credibility findings that the Board can only properly make at an evidentiary hearing. We express no opinion on voluntariness here. The only issue we address and decide is whether Dr. Middleton presented sufficient non-frivolous allegations of involuntary retirement to entitle him to an evidentiary hearing. We hold he did.

### CONCLUSION

While we do not reach the merits of Dr. Middleton's allegation of involuntary retirement, we conclude that Dr. Middleton has alleged facts that, if proven true, could establish a *prima facie* case of involuntariness. Based on this conclusion, we hold that the Board abused its discretion when it denied Dr. Middleton an evidentiary hearing. It dismissed his appeal simply on review of the documentary record, and without viewing as a whole all non-frivolous allegations of involuntary retirement.

Accordingly, the decision of the Board is *REVERSED–IN–PART, VACATED–IN–PART* AND *REMANDED.*

### COSTS

Respondent to bear costs.