**DISTRICT OF COLUMBIA METRO-POLITAN POLICE DEPART-MENT, Appellant**

v.

**Winfred L. STANLEY, John C. Daniels, and Reginald L. Smith, Appellees.**

No. 04–CV–1482.

District of Columbia Court of Appeals.

Argued Feb. 22, 2006.

Decided Feb. 28, 2008.

William J. Earl, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General at the time of argument, and Edward E. Schwab, Deputy Attorney General at the time of argument, were on the brief, for appellant.

Robert A.W. Boraks, with whom Stephen C. Leckar and Amy B. Jones, Washington, DC, were on the brief, for appellees.

Before RUIZ, GLICKMAN and FISHER, Associate Judges.

GLICKMAN, Associate Judge:

This appeal concerns the way the Metropolitan Police Department ("MPD") undertook to remove three of its district commanders, appellees Winfred Stanley,

Reginald Smith, and John Daniels. On the afternoon of February 13, 1998, each commander was called into the office of the Assistant Chief of Police and presented with a stark ultimatum. Stanley and Smith were told their employment would be terminated immediately unless they retired that very day. Daniels was given the same choice unless he agreed within the hour to accept a vaguely described demotion. The Assistant Chief of Police delivered this unwelcome and unexpected news at the behest of the new Interim Chief of Police, Sonya Proctor, purportedly under authority granted by the "Control Board."[1]

Stanley, Smith and Daniels each retired under protest. They then petitioned the District of Columbia Office of Employee Appeals ("OEA") to review their removals, claiming that MPD had forced them to retire involuntarily and, thus, had constructively discharged them in violation of their rights to continued employment. Following a long-delayed evidentiary hearing,[2] OEA senior administrative judge Joseph Lim issued an Initial Decision in which he credited the three employees' accounts and found "there were indeed coercive elements" [Appellant's Appendix at 150] in their interviews with the Assistant Chief of Police. Nonetheless, the administrative judge reasoned, the employees had alternatives to retirement: they could have "dared management to fire them without affording them their statutorily-mandated due process rights," and Daniels could have accepted his demotion. Concluding that the retirements therefore were voluntary, Judge Lim dismissed the petitions for lack of jurisdiction.[3]

Stanley, Smith and Daniels sought review of Judge Lim's Initial Decision in Superior Court. Judge Michael Rankin ruled that the administrative judge's findings of voluntariness were not supported by substantial evidence, and that appellees' retirements were involuntary as a matter of law. At Judge Rankin's invitation, the parties conferred and appellees then submitted a proposed order, which, among other things, directed OEA on remand to reinstate them to their former positions as commanders with corresponding back pay and benefits. MPD did not object to the remedial terms of the proposed order, including the reinstatement provisions, and Judge Rankin adopted it.

MPD has appealed Judge Rankin's decision to this court.[4] In doing so, MPD has changed its position in two significant respects. First, MPD now concedes that

---

1. As the then-existing District of Columbia Financial Responsibility and Management Assistance Authority was commonly known.

2. The petitions for review were filed in February 1998, but the OEA hearing was not held until July 2003. The delay was attributable to OEA's unexplained failure for two years to notify MPD of the petitions, and to a stay of proceedings pending the outcome of a civil lawsuit brought by Stanley, Smith and Daniels against the District government in federal district court. That lawsuit ended in December 2002 with an award of summary judgment to the defendants based on the plaintiffs' failure to exhaust their administrative remedies before the OEA.

3. Following federal precedents, the OEA has adhered to the rule that it "has jurisdiction over a retirement only if it is established that the decision to retire was involuntary." *Jefferson v. Dep't of Human Servs.*, OEA Matter No. J–0043–93, 47 D.C.Reg. 1587, 1589 (1995) (citing *Christie v. United States*, 207 Ct.Cl. 333, 518 F.2d 584, 587 (1975)). *See also Bagenstose v. District of Columbia Office of Employee Appeals*, 888 A.2d 1155, 1156 (D.C.2005) (affirming OEA decision that it lacked jurisdiction to review claim of employee who voluntarily retired before he could be terminated).

4. In the meantime, we are advised, OEA issued a reinstatement order complying with Judge Rankin's instructions. That order has been stayed pending this appeal.

Stanley and Smith did not retire voluntarily, and defends only the OEA judge's finding that Daniels did so. Second, though MPD agrees that Stanley and Smith are entitled to be reinstated, it now asserts that they should not be reinstated as commanders, but only as captains (a lower rank with reduced pay and benefits).

Thus, two issues remain for our consideration. The first issue is whether Daniels's retirement was voluntary. We conclude that the administrative judge's finding of voluntariness is not supported by substantial evidence and is contrary to governing law.[5] The second issue is whether Stanley, Smith and Daniels should be returned to duty as commanders. We hold that MPD is foreclosed from challenging their reinstatement as commanders because it acquiesced to that relief in Superior Court.

## I. Daniels's Retirement

 In the administrative proceeding before Judge Lim, Daniels had the burden of proving that he retired involuntarily, because "a retirement request initiated by an employee is presumed to be a voluntary act."[6] "The fact that an employee is faced with an inherently unpleasant situation or that his choice is limited to two unpleasant alternatives" is not enough by itself to render the employee's choice involuntary.[7] The test, an objective one,[8] is whether, considering all the circumstances, the employee was prevented from exercising a reasonably "free and informed choice."[9] As a "general principle" in this context, an employee's decision to retire or resign is said to be voluntary "if the employee is free to choose, understands the transaction, is given a reasonable time to make his choice, and is permitted to set the effective date."[10] With meaningful freedom of choice as the touchstone, courts have recognized that an employee's retirement or resignation may be involuntary if it is induced by the employer's application of duress or coercion,[11] time pressure,[12] or the misrepresentation or withholding of mate-

5. Although this appeal comes to us from the Superior Court, we review the OEA decision on the voluntariness of Daniels's retirement as if it had been appealed to us directly. *Raphael v. Okyiri,* 740 A.2d 935, 945 (D.C. 1999). Thus, confining ourselves to the administrative record, we must affirm the OEA unless its factual findings are not supported by substantial evidence or its decision is otherwise not in accordance with law. *See id.*; *District of Columbia v. King,* 766 A.2d 38, 44 (D.C.2001).

6. *Bagenstose,* 888 A.2d at 1157 (citations omitted).

7. *Covington v. Dep't of Health & Human Servs.,* 750 F.2d 937, 942 (Fed.Cir.1984).

8. *See Stone v. Univ. of Md. Med. Sys. Corp.,* 855 F.2d 167, 174 (4th Cir.1988) ("In applying this totality of circumstances test, the assessment whether real alternatives were offered must be gauged by an objective standard rather than by the employee's purely subjective evaluation; that the em-

ployee may perceive his only option to be resignation—for example, because of concerns about his reputation—is irrelevant.").

9. *Id.*

10. *Taylor v. United States,* 219 Ct.Cl. 86, 591 F.2d 688, 691 (1979) (quoting Federal Personnel Manual); *see also Stone,* 855 F.2d at 174.

11. Duress or coercion sufficient to vitiate voluntariness is typically found "where an agency imposes the terms of an employee's resignation, the employee's circumstances permit no alternative but to accept, and those circumstances were the result of improper acts of the agency." *Schultz v. United States Navy,* 810 F.2d 1133, 1136 (Fed.Cir.1987). *Accord Keyes v. District of Columbia,* 362 U.S.App. D.C. 67, 72, 372 F.3d 434, 439 (2004); *Staats v. United States Postal Serv.,* 99 F.3d 1120, 1124 (Fed.Cir.1996).

12. *See Middleton v. Dep't of Defense,* 185 F.3d 1374, 1381 (Fed.Cir.1999); *Schultz,* 810 F.2d

rial information.[13]

█ The evidence presented to the OEA and credited by Judge Lim showed that Daniels's retirement came about as follows. On the afternoon of Friday, February 13, 1998, his day off, Daniels was summoned from home for an unscheduled meeting at 2:45 p.m. with the Assistant Chief of Police, Robert C. White.[14] White informed Daniels that Interim Chief of Police Proctor had decided to replace him as Sixth District Commander, effective immediately. Further, White stated, Daniels had until 4:00 p.m. that day to decide whether to retire from the police force, accept a demotion to an unspecified position, or else be fired.[15] White denied Daniels's request for more time to make his decision, and he refused to tell Daniels how his pay and benefits would be affected if he accepted a demotion instead of leaving the force. Daniels, whose tenure as commander was unblemished, left the brief meeting with White in a state of shock and humiliation. As the 4:00 p.m. deadline loomed, Daniels attempted to ascertain from the MPD payroll office whether his demotion would entail a reduction of his salary, but the office was closed for the day.

At 4:00 p.m., Daniels telephoned White and accepted the demotion. White said Daniels would be moved to a night supervisor's position as an inspector, and that he would be given further details on Tuesday, February 17, after the President's Day weekend.[16] Over the next several hours, Daniels tried to collect his thoughts. He learned that his replacement as Sixth District commander had been announced to the public late that afternoon. He worried about the unknown financial consequences of his demotion; in particular, whether it would entail a pay cut and jeopardize his pension. Daniels's fears regarding the status of his pension were heightened when he learned how Stanley and Smith had been ousted and he spoke with Smith on Friday evening. Smith warned him that if he were to be fired, he would lose all of his pension rights.[17] Like his fellow

---

at 1136; *Perlman v. United States,* 203 Ct.Cl. 397, 490 F.2d 928, 932–33 (1974); *Paroczay v. Hodges,* 111 U.S.App. D.C. 362, 364, 297 F.2d 439, 441 (1961).

**13.** *See Cocome v. District of Columbia Lottery & Charitable Games Control Bd.,* 560 A.2d 547, 550–51 (D.C.1989); *Middleton,* 185 F.3d at 1382; *Covington v. Department of Health and Human Servs.,* 750 F.2d 937, 942–43 (Fed.Cir.1984); *Scharf v. Dep't of the Air Force,* 710 F.2d 1572, 1574–75 (Fed.Cir. 1983).

**14.** White's meetings with Stanley and Smith occurred earlier that afternoon.

**15.** At the administrative hearing, White testified that he did not state *explicitly* that Stanley, Smith and Daniels would be terminated if they did not retire (or, in Daniels's case, accept a demotion). Administrative Judge Lim found that the three ex-commanders "were more credible in their testimony in that they retired only because of their understanding

that the alternative to retirement given to them by their superiors was to lose their jobs altogether.... Proctor sought not just Employees' removal from their positions as commander but from employment as well."

**16.** According to Daniels, when he told White he would "take the demotion" and asked to know what his assignment would be, "[t]here was a little silence on the phone, and then he said, 'John, the only thing I have available is a night supervisor, so come in and see me Tuesday morning,' and he hung up the phone."

**17.** Daniels testified that

Commander Smith told me the information he had been able to get from the attorneys. He said, John, he said, well, you made one good decision, not to let them fire you, because the information that I get is that if you, to be able to get any of your pension, you got to be on the rolls at the time that you apply for those pensions. If not, you get nothing, and you and your family is

commanders, Daniels had been told by Chief Proctor's predecessor, former Chief of Police Soulsby, that the Control Board had given the Chief authority to fire them summarily and without cause. The interviews with Assistant Chief White appeared to confirm that assertion, which Daniels had no reason to doubt, but which MPD now concedes was erroneous.[18]

On Saturday morning, after an anxious night, Daniels tried to contact Chief Proctor to get more information about his situation. He could not reach her. Feeling that he needed to secure his pension and benefits before it was too late, Daniels then telephoned White and said he would retire. Although the 4:00 p.m. Friday deadline had passed, White accepted Daniels's decision. Saturday afternoon, Daniels wrote up his retirement application, in

which he complained how "the time constraint did not give me enough time to make an intelligent decision because I had not been considering retiring."[19] MPD nonetheless approved Daniels's retirement application expeditiously, waiving the usual sixty days' notice requirement for such requests. On March 5, 1998, not three weeks after his interview with White, Daniels wrote Chief Proctor a letter seeking to rescind his precipitous decision to retire.[20] She denied his plea.

■ MPD argues, and the administrative judge agreed, that Daniels's retirement was not coerced, but, rather, was voluntary as a matter of law, because he simply wanted to avoid a duty reassignment that the Chief of Police had the authority to make.[21] We believe that this argument fails to give due weight to other

going to be without any kind of money or compensation, and that was it.

18. Judge Lim found that the position of commander held by Daniels (and by Stanley and Smith) was an at-will position rather than a protected career service position. Even so, MPD acknowledges that the Chief of Police did not have the authority to terminate a commander's employment summarily. Rather, MPD agrees that a commander had a statutory right upon removal from that at-will position to be returned to the rank of captain, which is a protected career service position. *See* D.C.Code § 1–608.01(d–1) and § 5–105.01(a) (2001 & Supp.2007). Further, MPD agrees that under the Comprehensive Merit Personnel Act, non-probationary Career Service employees (including police captains) could not be removed except for cause after notice and an opportunity to be heard. *See* D.C.Code §§ 1–608.01(a)(5) and (13) and § 1–616.51 (2001 & Supp. 2007).

19. "Frantically," Daniels wrote, "I tried to contact the retirement and benefits office to gain some insight into how I would be affected if I chose to retire [versus] a demotion. I was met with confusion and was informed that I could not be helped any more until Tuesday, February 17, 1998"—after the deadline he had been given for his decision.

20. In that letter, Daniels explained why he had opted to retire as follows:

> Fearing that I would lose my entitlements afforded to me by my career service, I chose to accept the option offered by the assistants that I felt would provide me the greatest protection. I clearly exercised this option (which was to immediately retire from the active roles of the department) under duress and without the benefit of the career advisors and support services normally afforded to our employees. All options were given arbitrarily, capriciously and without supporting merit.
> Having since had the opportunity to consult with these advisors and support services personnel, I have given further consideration to my decision to optionally retire from the department. I have concluded that I would like to hold my retirement in abeyance and continue my career as an active sworn member of the department.

21. Daniels contends that the authority to reassign commanders was vested by statute in the Mayor and the Control Board, and that neither the Mayor nor the Board had delegated that authority to the Chief of Police. We decide this case in Daniels's favor on other grounds without reaching the merits of that contention.

crucial elements of the legal equation. As a general matter, it is true, "the doctrine of coercive involuntariness ... does not apply to a case in which an employee decides to resign or retire because he does not want to accept a new assignment, a transfer, or other measures that the agency is authorized to adopt, even if those measures make continuation in the job so unpleasant for the employee that he feels that he has no realistic option but to leave." [22] But Daniels met his burden of showing that his decision to retire was induced by other factors that, in combination, substantially undermined his freedom of choice—namely, the extremely short time frame in which he was forced to elect between retirement and demotion (or, it appeared, termination); his inability to obtain information from MPD about the financial consequences of that election; and the daunting misrepresentation that the Chief of Police could fire him summarily at any time without cause or due process.[23] We grant that time pressure or deficient information may be present to a greater or lesser degree in many unquestionably voluntary retirement and resignation decisions. Nevertheless, in this case those handicaps were severe ones. The evidence is undisputed that MPD pressed Daniels to make a life-changing decision on the spur of the moment. The evidence also is undisputed that the urgency Daniels felt was exacerbated by his inability, in the time permitted him, to make an *informed*

choice—an inability for which MPD was wholly responsible. "A decision made 'with blinders on,' based on misinformation or a lack of information, cannot be binding as a matter of fundamental fairness and due process." [24] There is no evidence that any other circumstance relieved or mitigated the duress under which Daniels was placed.

In short, MPD compelled Daniels to decide his fate in haste and ignorance. While the law permits an agency to put its employee to "a hard choice" between unpleasant alternatives, the law also requires that the choice "be understood by the employee and ... be freely made." [25] Considering the time pressure and the informational disability together, we cannot find sufficient evidence in the record to support the administrative judge's determination that Daniels retired voluntarily. On the contrary, he indisputably made his decision under duress, and we hold that it was involuntary as a matter of law.

## II. The Remedy of Reinstatement

■ Given MPD's concession on appeal that Stanley and Smith retired involuntarily, we conclude that the administrative judge erred in dismissing all three appellees' review petitions for lack of jurisdiction. Ordinarily, upon arriving at such a conclusion, we would remand to the OEA for it to decide all remaining issues. But the jurisdictional question merges with the

---

**22.** *Staats,* 99 F.3d at 1124.

**23.** *Cf. Staats,* 99 F.3d at 1125 ("This court has recognized that an employee can make a factual showing sufficient to call for a hearing on misrepresentation-based involuntariness, while falling short of the showing necessary to mandate a hearing on coercion-based involuntariness.").

**24.** *Covington,* 750 F.2d at 943. *Accord, Cocome,* 560 A.2d at 550; *Middleton,* 185 F.3d at 1382.

**25.** *Covington,* 750 F.2d at 943. *See also Paroczay,* 111 U.S.App. D.C. at 364 n. 4, 297 F.2d at 441 n. 4 ("The issue of coercion is not solved by accepting the contention of defendants that there was no obligation to give the employee an option to resign; for this does not answer the question whether the resignation which was given was coerced.").

merits in this case, and MPD concedes that an order of reinstatement with back pay is appropriate in these circumstances.[26] Its sole contention is that Judge Rankin erred by directing that appellees be reinstated *as commanders*, because—MPD argues—the Chief of Police could and would have reduced appellees to the rank and pay of a captain (or, in Daniels's case, an inspector) had they not retired.[27]

The factual premise of MPD's argument is open to question. At the administrative hearing, Chief Proctor testified that "it wasn't clear what next steps would [have been] available" had Stanley, Smith or Daniels refused to resign or accept a demotion, and that her "only option" in that event would have been to place them on administrative leave and consult with MPD's general counsel and the Control Board. Assistant Chief White testified that he, too, did not know what would have happened had the commanders rejected the offers he made to them. More importantly, even assuming they would have been demoted in rank, the administrative judge found that former commanders usually retained their salaries. The judge consequently found that Daniels's proposed demotion would not necessarily have involved any reduction in his pay. In contrast to its position now that appellees should be returned to lower-salaried posi-

tions, MPD defended that finding in Superior Court.

In any event, we conclude that MPD waived its claim regarding the terms of the order of reinstatement. When Judge Rankin found that appellees' retirements were involuntary, he invited the parties to confer and submit a proposed remand order. In compliance with the court's request, appellees drafted an order and shared it with MPD for its comments. The draft order mandated, *inter alia*, that OEA direct MPD to return appellees to their former commander positions. MPD suggested changes in the language of the draft order, some of which appellees accepted. After appellees provided the revised draft order to the court, MPD filed a praecipe stating that "in light of the proposed order Petitioners have submitted, the Department has elected not to submit an alternate proposed order." Although MPD preserved its objections to the court's finding that appellees' retirements were involuntary, MPD did not object to the reinstatement relief or other remedial provisions that appellees requested. MPD did not argue that appellees were entitled to be returned only to the lower ranks to which the Chief of Police would have reduced them.

 "It is a well established principle of appellate review that arguments not made at trial may not be raised for the first time on appeal."[28] Perhaps even

---

26. *See, e.g., Scharf,* 710 F.2d at 1575–76 (ordering agency to cancel protected civil service employee's involuntary retirement and reinstate him to his former position with back pay). The federal Back Pay Act, which applies to the District of Columbia government, provides that an employee who has suffered wage loss as the result of "an unjustified or unwarranted personnel action" is entitled to full restitution. 5 U.S.C. § 5596(b)(1) (2007); *see Mitchell v. District of Columbia,* 736 A.2d 228, 230–32 (D.C.1999).

27. See footnote 18, *supra.* MPD has advised the court that the position of inspector is an at-will position like that of commander.

28. *District of Columbia v. Califano,* 647 A.2d 761, 765 (D.C.1994) (holding that District of Columbia waived its argument that appellees were not entitled to an income tax credit by failing to assert the argument in the trial court). *See Miller v. Avirom,* 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967).

more to the point—since, in Superior Court, MPD both disputed that Daniels's demotion would have affected his pay and acquiesced in the reinstatement proposal submitted to Judge Rankin—"we have repeatedly held that a litigant may not take one position at trial and a contradictory position on appeal." [29] "A court deviates from [these] principle[s] only in exceptional situations and when necessary to prevent a clear miscarriage of justice apparent from the record." [30] We see no such danger in the present case.[31]

The order of the Superior Court reversing the Initial Decision of the OEA and remanding the case with instructions as set forth therein is *affirmed.*

**29.** *Hollins v. Fed. Nat'l Mortgage Ass'n,* 760 A.2d 563, 572 (D.C.2000) (quoting *Brown v. United States,* 627 A.2d 499, 508 (D.C.1993)) (internal quotation marks and brackets omitted).

**30.** *Williams v. Gerstenfeld,* 514 A.2d 1172, 1177 (D.C.1986) (citations omitted). *See District of Columbia v. Helen Dwight Reid Educ. Found.,* 766 A.2d 28, 33–34 n. 3 (D.C.2001).

**31.** Assuming that Judge Rankin's order is to be read literally as reinstating appellees to their former positions as district commanders—and not as merely restoring them to their former ranks with corresponding pay and benefits—MPD has not claimed that compliance with the order would pose any practical difficulties. Presumably, if the commander positions were at-will, as MPD claims, the Mayor (or his designee) remains free to reassign appellees at any time. *Cf. Settlemire v. District of Columbia Office of Employee Appeals,* 898 A.2d 902, 905 n. 6 (D.C.2006). MPD's contention that the Back Pay Act entitles appellees to no more than captain's or inspector's pay falls flat in light of MPD's previous position that Daniels's demotion would not have entailed a salary reduction.