# United States Court of Appeals for the Federal Circuit

---

**MATT CAHILL,**
*Petitioner*

**v.**

**MERIT SYSTEMS PROTECTION BOARD,**
*Respondent*

---

2015-3152

---

Petition for review of the Merit Systems Protection Board in No. AT-1221-14-0906-W-1.

---

Decided: May 10, 2016

---

JASON LEE ROMRELL, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington, DC, argued for petitioner. Also represented by JAMES R. BARNEY; J. DEREK MCCORQUINDALE, DANIEL CRAIG COOLEY, Reston, VA.

KATRINA LEDERER, Office of the General Counsel, Merit Systems Protection Board, Washington, DC, argued for respondent. Also represented by BRYAN G. POLISUK.

---

Before PROST, *Chief Judge,* LOURIE and TARANTO, *Circuit Judges.*

TARANTO, *Circuit Judge.*

Matt Cahill was an employee of the United States Department of Health and Human Services in the Centers for Disease Control and Prevention from March 2011 until July 2014. In February 2014, he complained that agency officials had taken personnel actions against him in retaliation for his having raised concerns, at a March 2012 meeting, about his agency's data-gathering equipment and procedures. When he brought that complaint to the Merit Systems Protection Board, the Board concluded that it lacked jurisdiction to hear it because Mr. Cahill had not presented nonfrivolous allegations that his March 2012 disclosure was known to at least one of the agency officials he charged with taking the challenged personnel actions. We conclude otherwise, and we therefore reverse and remand.

## BACKGROUND

From December 2003 until March 2008, Mr. Cahill did information-technology work for the Centers for Disease Control and Prevention as an independent contractor. In March 2011, the agency hired him as an employee within a division having the prevention of HIV/AIDS as its mission. His job was within the Quantitative Science and Data Management Branch (or group) within that division (QSDM or QSDMB), but his assignment was "to support Data Management activities" of another part of the same division, *i.e.*, the Behavioral and Clinical Surveillance Branch (BCSB), which, among other things, conducts studies for which its field workers use hand-held devices called "Pocket PCs" to collect data. J.A. 90–91, 144.

On February 27, 2014, Mr. Cahill filed a complaint with the Office of Special Counsel, 5 U.S.C.

§ 1214(a)(1)(A), alleging that agency officials had violated the whistleblower protections of 5 U.S.C. § 2302(b)(8)(A) by taking personnel actions against him as a result of a disclosure about agency practices that he had made at a March 2012 meeting.[1]  In his complaint, Mr. Cahill alleged:

> On March 22, 2012, there was a group meeting with BCSB management, team leads, project leads, and QSDM management.

J.A. 145.  At that meeting, Mr. Cahill alleged, he voiced his concerns about some of the agency's data-collection instruments and procedures, including that the Pocket PCs were outdated, had bad batteries, lost data, presented data-entry problems, and generally did not work properly.  Mr. Cahill contended that his supervisors began treating him differently after that meeting; that he was not invited to BCSB meetings, was discouraged from participating in projects to which he was assigned, and was eventually placed on a Performance Action Plan; that he "had problems with Assistant Branch Chief, Dawn Gnesda," J.A. 145, who purportedly retaliated against him by changing his telework agreement and providing him with negative feedback; that he received a September 2012 email asking him not to participate in certain BCSB activities; that he received a negative Performance Management Appraisal Program review; and that Kim Crenshaw, his supervisor as of June 13, 2013, treated him poorly.

---

[1]  Mr. Cahill also alleged that the agency had improperly reduced his pay in 2008 as a result of a disclosure he had made in 2004 when he served as an independent contractor.  The Board found no jurisdiction over that allegation, and Mr. Cahill does not challenge that ruling here.

The Office of Special Counsel found an insufficient basis to pursue detailed investigation of Mr. Cahill's claim and so closed its file on the matter. Mr. Cahill then filed an individual-right-of-action appeal with the Board under 5 U.S.C. §§ 1214(a)(3)(A), 1221(a). After receiving Mr. Cahill's brief, which largely reiterated his allegations to the Office of Special Counsel, an administrative judge ordered Mr. Cahill to show why his appeal should not be dismissed for lack of jurisdiction. In response, Mr. Cahill repeated much of his complaint to the Office of Special Counsel, including the above-quoted passage. He also added several exhibits, including a Performance Management Appraisal Program document reviewed by Timothy Green and a Performance Assistance Plan memorandum written by Mr. Green (identified by the memorandum as chief of QSDMB), as well as an email from Dr. Jacek Skarbinski (identified in the signature block as team lead of the BCSB Clinical Outcomes Team) informing Mr. Cahill that his support would not be needed for certain agency projects. The administrative judge concluded that Mr. Cahill had not presented enough to constitute nonfrivolous allegations of various elements of a whistleblower claim under 5 U.S.C. § 2302(b)(8)(A), and the judge therefore dismissed the appeal for lack of Board jurisdiction.

On review under 5 C.F.R. § 1201.114(c), the Board modified but ultimately affirmed the administrative judge's decision. Disagreeing with the administrative judge, the Board concluded that Mr. Cahill had nonfrivolously contended that his March 2012 disclosure was protected: his disclosure was of information he reasonably believed evinced gross mismanagement and presented a substantial and specific danger to public health and safety. The Board also determined that Mr. Cahill had alleged at least one statutorily covered personnel action (placement on a performance plan) and that more such actions may exist, including the alleged performance

evaluation and a significant change in duties, responsibilities, or working conditions. *See* 5 U.S.C. § 2302(a)(2)(A)(viii), (xii). According to the Board, however, where Mr. Cahill failed was in adequately connecting those allegations. Specifically, the Board concluded that Mr. Cahill had failed nonfrivolously to allege that "his 2012 disclosure was a contributing factor in a personnel action" for one reason: he lacked a nonfrivolous allegation that any of the officials involved in the personnel actions knew of his March 2012 disclosure. J.A. 2, 11. On that sole basis, the Board determined that it lacked jurisdiction and dismissed the appeal. *See* 5 U.S.C. § 1221(e)(1).

Mr. Cahill appealed to this court. *Id.* § 7703(b)(1). We have jurisdiction under 28 U.S.C. § 1295(a)(9).

## DISCUSSION

We review de novo the Board's determinations as to its jurisdiction. *Kahn v. Dep't of Justice*, 528 F.3d 1336, 1341 (Fed. Cir. 2008).

To establish the Board's jurisdiction in an individual-right-of-action appeal, it suffices that an appellant exhaust his remedies before the Office of Special Counsel and present "non-frivolous allegations" that (1) he made a protected disclosure under 5 U.S.C. §§ 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D) and that (2) the disclosure was a contributing factor in the agency's decision to take or fail to take a personnel action as defined by 5 U.S.C. § 2302(a). *See* 5 U.S.C. § 1221(e)(1); *Kahn*, 528 F.3d at 1341; *Spruill v. Merit Sys. Prot. Bd.*, 978 F.2d 679 (Fed. Cir. 1992). And the court has long treated "a non-frivolous allegation" of an element required for Board jurisdiction as one that, "if proven, can establish the Board's jurisdiction" insofar as that element is concerned. *Garcia v. Dep't of Homeland Sec.*, 437 F.3d 1322, 1330 (Fed. Cir. 2006) (en banc) (constructive discharge context); *id.* at 1344; *Dumas v. Merit Sys. Prot. Bd.*, 789 F.2d 892, 894 (Fed. Cir. 1986) ("non-frivolous allegation" of jurisdic-

tional element is one that "if proven could make a prima facie case" on that element).

In this case, there is no dispute about exhaustion, about the protected character of the March 2012 disclosure, or about the existence of one or more personnel actions taken against Mr. Cahill. The dispute is limited to the "contributing factor" element. Accordingly, we need only analyze whether Mr. Cahill has nonfrivolously alleged that his March 2012 disclosure was a contributing factor in at least one such personnel action.

The statute expressly addresses how the "contributing factor" element of the whistleblower claim can be established. It can be established "through circumstantial evidence, such as evidence that (A) the official taking the personnel action knew of the disclosure . . . ; and (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure . . . was a contributing factor in the personnel action." 5 U.S.C. § 1221(e)(1). And as this case comes to us, the only disputed issue is whether any of the agency officials taking the challenged personnel actions knew of the March 2012 disclosure.

Accordingly, the question at this stage is whether Mr. Cahill has nonfrivolously alleged such knowledge. On that question, we reach a conclusion different from that of the Board. Reading Mr. Cahill's assertions in light of the entire "written record," *Kahn*, 528 F.3d at 1341, we conclude that Mr. Cahill has sufficiently alleged that such an agency official did have such knowledge.

In the key sentence set out above, Mr. Cahill alleged that "[o]n March 22, 2012, there was a group meeting with BCSB management, team leads, project leads, and QSDM management." J.A. 145. He did not give the names of the meeting's attendees; elaborate on how many people fit each of the descriptions "BCSB management," "team leads," "project leads," and "QSDM management";

or expressly state that the particular officials he alleged to have committed the personnel actions at issue knew of the March 2012 disclosure. Nevertheless, when read with an eye on likely inferences appropriate to the context, Mr. Cahill's allegations are sufficiently specific and plausible to constitute nonfrivolous assertions that at least one, and perhaps three, of the officials charged with the personnel actions at issue attended the March 2012 meeting or at least knew what Mr. Cahill disclosed there.

One such official is Ms. Gnesda, who, the Board's brief to us indicates, served as Assistant Branch Chief of the BCSB, MSPB Br. 24, and hence was "BCSB management," J.A. 145. The written record before the Board included Mr. Cahill's identification of Ms. Gnesda as "Assistant Branch Chief," *id.*, along with his explanation that, though his job was in the QSDMB, his assignment in that job was to provide data-management support for BCSB, *id.*; J.A. 90–91, ¶¶ 25–27. That Ms. Gnesda's position was in BCSB in particular (not QSDMB) is consistent with Mr. Cahill's description of the alleged personnel actions that she took after the March 2012 meeting: changing his telework agreement, providing him with negative feedback, and instructing him to stop participating in the BCSB's Medical Monitoring Project. And the record before the Board also included notes made by Ms. Gnesda, recording: "March 22, 2012—Meeting with all BCSB team leaders, BCSB Branch Chief, BCSB Associate Chief for Science, Matt [Cahill], and Thom Sukalac." J.A. 322.

A second pertinent official is Mr. Green, whom Mr. Cahill accused of taking personnel actions against him after the March 2012 meeting. The record makes clear that Mr. Green was "Chief, Quantitative Sciences and Data Management Branch (QSDMB), Division of HIV/AIDS Prevention." J.A. 125. That is, Mr. Green was "QSDM management," J.A. 145; he was the head of the branch for which Mr. Cahill formally worked. Ms.

Gnesda's notes also indicate that Mr. Green was the Branch Chief for QSDM. J.A. 323.

The third pertinent official is Dr. Skarbinski. Mr. Cahill charged that, after the March 2012 meeting, Dr. Skarbinski newly excluded him from various BCSB meetings and activities. The record indicates that Dr. Skarbinski was "Team Lead, Clinical Outcomes Team, Behavioral and Clinical Surveillance Branch." J.A. 117. "Team leads" is one of the categories of asserted participants in the March 2012 meeting. J.A. 145.

Whether Mr. Cahill has nonfrivolously alleged facts sufficient to establish the Board's jurisdiction depends on how his allegations would be understood in context, especially by the responding agency. *See Middleton v. Dep't of Def.*, 185 F.3d 1374, 1379–81 (Fed. Cir. 1999). Here, it is notable that in the proceedings before the administrative judge and the Board, the agency, while challenging Mr. Cahill's allegations regarding several elements of the whistleblower claim, did not contend that Mr. Cahill had inadequately alleged that any of the officials charged with the personnel actions knew of Mr. Cahill's disclosures at the March 2012 meeting. *See* Oral Arg. at 11:55–12:45, 13:15–16:10; J.A. 442–49. The agency's silence on that issue is significant to our assessment of the adequacy of Mr. Cahill's allegations.

The silence suggests that, read in context, Mr. Cahill's allegations adequately communicated that Ms. Gnesda, Mr. Green, Dr. Skarbinski, or all three attended the March 2012 meeting or knew what was said there. In particular, it suggests that there were so few leaders of the branches and teams identified by Mr. Cahill that his allegations about "a group meeting with BCSB management, team leads, project leads, and QSDM management," J.A. 145, adequately conveyed a contention that at least Ms. Gnesda, Mr. Green, or Dr. Skarbinski, or all three, either attended or would have learned of what

transpired at that meeting. Moreover, the agency would have known, or been able readily to check, both the organizational facts and the roles and knowledge of the three individuals. Indeed, nothing in the record indicates that there is more than one branch chief or assistant chief, *see, e.g.*, J.A. 421 (identifying Sam Costa as "*[t]he* QSDM assistant branch chief*") (emphasis added), and the Board at oral argument before us confirmed its belief that each team has only one team lead, Oral Arg. at 19:08–18.

The agency's silence on the point is significant in a second way: it deprived Mr. Cahill of notice that his allegations might require greater specificity—which he might well have provided if the need had been identified. The importance of notice of deficiencies before a claim is finally dismissed is reflected in district courts' common practice of providing an opportunity to amend an insufficiently specific complaint after the deficiencies have been identified.[2] The Board itself has permitted an agency to

---

[2] *See, e.g.*, Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."); 5 Charles Alan Wright et al., Federal Practice and Procedure § 1216 (3rd ed. 2004) ("The pleader is entitled to considerable latitude regarding the mode of stating a claim for relief, provided the pleading gives reasonable notice of the claims that are being asserted. . . . [I]f the requisite allegations are not in the complaint and a motion to dismiss for failure to state a claim upon which relief may be granted is made . . . the pleader should be given the opportunity to amend the complaint, if she can, to show the existence of the missing elements."); 10A Wright et al., *supra*, § 2722 ("[W]hen plaintiff's motion to amend the complaint and defendant's motion for summary judgment are presented together, the court may consider the latter as addressed to the complaint in the form in which it is sought to be amended. . . .

seek a more definite statement where necessary, *Zimmerman v. Dep't of Hous. & Urban Dev.*, 61 M.S.P.R. 75, 77 (1994), and permitted claimants in other contexts to amend their pleadings, *Shelton v. Office of Pers. Mgmt.*, 38 M.S.P.R. 280, 283 (1988) (citing as guidance Federal Rule of Civil Procedure 15(a)); *see also Balagot v. Dep't of Def.*, 102 M.S.P.R. 96, 98–99 (2006). But without an objection from the agency as to the specificity of his allegations concerning agency officials' knowledge, Mr. Cahill was not on notice that his allegations should be made more specific, such as by giving the names of the March 2012 meeting participants or the number of individuals who could fit the categories of participants (*e.g.*, "BCSB management") or by otherwise indicating why Ms. Gnesda, Mr. Green, or Dr. Skarbinski would likely have known of his March 2012 disclosure. Thus, this is not a case in which the absence of readily available details highlights the inadequacy of what is alleged; here, given the lack of notice of a problem and an opportunity to cure, the absence of greater detail provides no support for judging the allegations Mr. Cahill did make to be inadequate.

We conclude that Mr. Cahill nonfrivolously alleged that at least one of Ms. Gnesda, Mr. Green, and Dr. Skarbinski knew of his March 2012 disclosure. We need not consider the sufficiency of Mr. Cahill's allegations as to other agency officials. We hold that the Board erred in dismissing his appeal for lack of jurisdiction.

---

[I]f an amendment would change the result on the [summary judgment] motion, it should be permitted and summary judgment denied.").

CONCLUSION

For the foregoing reasons, we reverse the Board's dismissal of Mr. Cahill's petition and remand for further appropriate proceedings.

Costs awarded to Mr. Cahill.

**REVERSED AND REMANDED**